UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **David Smith and Misty Smith**,<br>*Plaintiffs,*<br><br>v.<br><br>**Travelers Personal Insurance Company, The Travelers Indemnity Company, and Benjamin Ramseier**,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 4:25-cv-03671<br><br>Jury Demanded |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

David Smith and Misty Smith, Plaintiffs herein, file Plaintiffs' First Amended Complaint ("Complaint") against Travelers Personal Insurance Company, The Travelers Indemnity Company, and Benjamin Ramseier, and, in support of their causes of action, David Smith and Misty Smith would respectfully show the Court the following:

### I. THE PARTIES

1. Plaintiffs, David Smith and Misty Smith, are individuals residing at 3505 Parkway Terrace, Bryan, Brazos County, Texas 77802, which is their true, fixed, and permanent home.

2. Defendant Travelers Personal Insurance Company ("Travelers Personal," NAIC 38130) was when this action was filed, and remains, a Connecticut corporation with its principal place of business at One Tower Square, Hartford, Connecticut 06183, and is not a citizen of Texas. Travelers Personal is authorized to write property insurance in Texas and issued Policy 6031790096331 to Plaintiffs. It may be served through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

3. Defendant The Travelers Indemnity Company ("Travelers Indemnity," NAIC 25658) is a Connecticut corporation with its principal place of business at One Tower Square, Hartford, Connecticut 06183, and is not a citizen of Texas. Travelers Indemnity employs Defendant Ramseier and is the registered owner of the travelers.com domain. It also operates the shared claims-handling infrastructure, including the Western Gulf Claim Center, through which adjusters handle claims for affiliated Travelers companies, including Travelers Personal. It may be served through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

4. Defendant Benjamin Ramseier ("Ramseier") is an individual domiciled in Brazos County, Texas. At all material times, Travelers Indemnity employed Ramseier as an Outside Property Claims Representative and Technical Specialist assigned to its Western Gulf Claim Center. It deployed him to adjust claims for Travelers Personal, including the claim at issue. Ramseier sent the estimates and communications described in this Complaint from his Travelers email account, BRAMSEIE@travelers.com.

5. Travelers Personal is a wholly owned subsidiary of The Standard Fire Insurance Company ("Standard Fire"). Standard Fire and Travelers Indemnity are both wholly owned by Travelers Insurance Group Holdings Inc. ("TIGHI"). TIGHI is wholly owned by Travelers Property Casualty Corp. which is wholly owned by The Travelers Companies, Inc. ("TRV," NYSE: TRV). Travelers Personal and Travelers Indemnity are therefore affiliates under common ownership. The Policy Declarations identify Travelers Personal as "a subsidiary or affiliate of The Travelers Indemnity Company." In this Complaint, "Travelers" means Travelers Personal and Travelers Indemnity collectively, or whichever entity the context indicates. "Defendants" means Travelers Personal, Travelers Indemnity, and Ramseier.

6. Travelers Lloyds of Texas Insurance Company ("Travelers Lloyds") is also a wholly owned subsidiary of Travelers Indemnity. Travelers Lloyds issues first-party residential property-damage insurance policies in Texas through the same shared claims infrastructure

operated by Travelers Indemnity. Travelers Lloyds is not a defendant in this action but is identified as an enterprise and co-conspirator for purposes of the RICO claims below.

7. Travelers Personal issued the Policy. The claims-handling functions at issue were performed through shared claims infrastructure operated by Travelers Indemnity: adjuster deployment, inspections, estimates, ALE authorization, and coverage communications. The Policy identifies Travelers Personal as "Your Insurer." It defines "we," "us," and "our" as the member company of Travelers shown as "Your Insurer." The Policy does not disclose that an employee of a different Travelers company would adjust claims under it. Ramseier's estimates identified the company as Travelers Personal and listed him as its claim representative. At no time did Defendants disclose to Plaintiffs that Ramseier was employed by Travelers Indemnity. All of Ramseier's emails bore the travelers.com domain. His estimates were presented as Travelers' coverage positions without distinguishing between the two entities.

8. Travelers Personal is liable for all of Ramseier's conduct under three alternative and cumulative theories: (a) actual agency — it assigned Ramseier as principal adjuster on the Claim (see Travelers Answer, September 23, 2025, ¶14), with authority to inspect, prepare estimates, authorize ALE, and communicate coverage positions; (b) apparent authority — it held Ramseier out as its adjuster, including on its estimates, without disclosing that Travelers Indemnity employed him; and (c) borrowed servant — it controlled the details of his work on the Claim, including review and approval of his estimates and coverage classifications. Travelers Indemnity is independently liable for all of Ramseier's conduct as his employer under respondeat superior, and for hiring, training, supervising, and retaining him. At all material times, Ramseier acted within the course and scope of his employment and within his general authority, in furtherance of Travelers' business of adjusting the Claim, including during the October 21, 2024 inspection, when his threats and ALE conditioning arose directly from the scope and estimate dispute he was assigned to resolve. Both Travelers entities ratified his conduct by retaining him on the Claim without discipline or reassignment after the October 21, 2024 threats, adopting his estimates and coverage positions—including the microbial classification—as their own, and extending ALE only

after the Smiths complied with his conditions. His coverage decisions were authorized, reviewed, and approved by supervisory personnel, as he acknowledged on October 21, 2024: "it will end up getting reviewed, probably general counsel and all those other people that involved on big decisions, big money decisions." Travelers Personal and Travelers Indemnity also acted as agents of one another in handling the Claim through their shared claims infrastructure and are jointly liable under a joint-enterprise and agency theory. Travelers Personal's duties of good faith and fair dealing and its duties under Texas Insurance Code Chapters 541 and 542 are non-delegable, so it is liable for the conduct of any adjuster it deploys. Under Tex. Ins. Code § 541.002(2), Ramseier and Travelers Indemnity are "persons" engaged in the business of insurance; Plaintiffs assert the Chapter 541 claims against Travelers Personal and Travelers Indemnity only.

## II. Jurisdiction and Venue

9. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 over Counts 10 and 11, which arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Ramseier is named only in Counts 10 and 11, and no state-law claim is asserted against him. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the state-law claims against Travelers Personal and Travelers Indemnity because those claims arise from the same claim, loss, and recorded inspection and form part of the same case or controversy. Complete diversity independently exists between Plaintiffs, who are citizens of Texas, and Travelers Personal and Travelers Indemnity, each a citizen of Connecticut, and the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1). Accordingly, Counts 1–9 also rest on diversity jurisdiction. Ramseier is a Texas citizen, but he is not a required party under Federal Rule of Civil Procedure 19 to any state-law claim and is a dispensable party. If Counts 10 and 11 are dismissed, Plaintiffs request that Ramseier be dismissed without prejudice under Federal Rule of Civil Procedure 21 and that the Court retain diversity jurisdiction under § 1332 over all remaining claims against Travelers Personal and Travelers Indemnity, rather than decline jurisdiction under § 1367(c)(3).

10. Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(2) because the Property is in Brazos County, Texas, within the Houston Division, and a substantial part of the events giving rise to the claims occurred there. Venue for the RICO claims is also proper under 18 U.S.C. § 1965(a) because Travelers Personal and Travelers Indemnity transact their affairs in this District and Ramseier resides here.

**Relation Back and Timeliness as to Travelers Indemnity**

11. Plaintiffs filed the original complaint on August 6, 2025, in Case No. 4:25-cv-03671, Doc. 1 (the "Original Complaint"), naming Travelers Personal but not Travelers Indemnity. The claims against Travelers Indemnity arise from the same conduct, transaction, and occurrence alleged in the Original Complaint and concern the same insurance Claim and loss.

12. The same conduct includes Travelers' handling of Claim I8C4809; the 27-day delay before inspection; the limitations imposed on PuroClean's scope; the recommendation and resulting protocol for a mold report; the classification of water-related damage as microbial damage; the authorizations and conditioning of Additional Living Expenses; and Ramseier's October 21, 2024 threats and conditioning of further ALE. These facts and the resulting injuries are the conduct, transaction, and occurrence alleged in the Original Complaint. Fed. R. Civ. P. 15(c)(1)(B)–(C).

13. The Original Complaint alleged that "Travelers is vicariously liable for the intentional torts and negligence of its employee, Ben Ramseier." Original Complaint ¶98. Plaintiffs made a mistake concerning the identity of the proper Travelers entity because Defendants did not disclose that a different Travelers company employed Ramseier; his estimates identified Travelers Personal and him as its claim representative; and his emails used the travelers.com domain.

14. The Policy defined "we," "us," and "our" as the member company shown as "Your Insurer" and did not disclose that another Travelers company would adjust claims. The Declarations described Travelers Personal as "a subsidiary or affiliate of The Travelers Indemnity Company." Travelers Answer on September 23, 2025, admitted that Ramseier "was assigned to investigate, evaluate, and adjust" the Claim but did not disclose his employer. Defendant's Certificate of Interested Persons and Rule 7.1 Disclosure Statement, filed November 14, 2025 (Dkt. 8),

represented that it was a "complete list" of all affiliates and other entities that "may have a financial interest in the outcome of this litigation," yet it did not identify Travelers Indemnity, the employer of the adjuster whose conduct the Original Complaint described. Plaintiffs first learned that Travelers Indemnity employed Ramseier on or about September 2026.

15. Travelers Indemnity received notice of the action within the 90-day period prescribed by Rule 4(m) after August 6, 2025, and suffered no prejudice in defending the claims. Travelers Personal and Travelers Indemnity used the same registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218, and shared the principal office at One Tower Square, Hartford, Connecticut 06183. They also shared common ownership through TIGHI.

16. Travelers Indemnity operates the Western Gulf Claim Center and the shared claims infrastructure that handled the Claim and employed the adjuster central to the Original Complaint. On information and belief, the claim file, litigation hold, and defense were administered through that shared infrastructure and Travelers Indemnity personnel, and Travelers Personal's counsel was retained through the same Travelers claims and legal organization. These circumstances establish an identity of interest between Travelers Personal and Travelers Indemnity for purposes of notice and prejudice.

17. Travelers Indemnity knew or should have known that, but for Plaintiffs' mistake concerning the identity of the proper Travelers entity, it would have been named in the Original Complaint. Travelers Indemnity employed Ramseier, operated the claims infrastructure through which he handled the Claim, and had notice of the action and of the claims arising from his conduct. See Krupski v. Costa Crociere S.p.A., 560 U.S. 538 (2010).

18. Plaintiffs allege that all claims against Travelers Indemnity relate back to August 6, 2025, under Fed. R. Civ. P. 15(c)(1)(B)–(C), because the claims arise from the same conduct, transaction, and occurrence and Travelers Indemnity received timely notice without prejudice and knew or should have known that it was the proper party.

19. Alternatively, the claims against Travelers Indemnity are independently timely. Counts 7, 10, and 11 are subject to four-year limitations periods. The Chapter 541, DTPA, and tort claims

arise from the October 21, 2024 conduct, the November 4, 2024 and February 21, 2025 estimate transmissions, the 84-day delay, and later conduct, and accrued within two years before the filing of this Amended Complaint.

20. Plaintiffs did not discover Travelers Indemnity's role as Ramseier's employer until on or about September 2026. Defendants' nondisclosure of Ramseier's employer constitutes fraudulent concealment that tolled limitations as to Travelers Indemnity. Accordingly, the claims against Travelers Indemnity are timely under each applicable limitations period, independently of relation back.

## III. Statement of Facts

**A: The Policy and Covered Loss Narrative**

21. Plaintiffs David Smith and Misty Smith purchased their home at 3505 Parkway Terrace, Bryan, Texas, and insured it under Policy 6031790096331 issued by Travelers Personal Insurance Company. When catastrophic water damage occurred in July 2024, Plaintiffs looked to their insurer for the coverage they had purchased.

22. This Complaint alleges numerous failures by Travelers in handling the Smiths' Claim. The Smiths have effectively lost over two years of their lives and will continue to suffer the consequences of Defendants' conduct into the future.

23. This Complaint alleges adversarial and threatening conduct, misrepresentations, fraud, and extortion by Defendants that is far outside the bounds of acceptable and lawful behavior.

24. David Smith and Misty Smith (collectively, "Smiths," "Plaintiffs," or individually, a "Plaintiff") are the named insureds under a property insurance policy issued by Travelers identified as Policy 6031790096331 ("Policy"). The Policy insured the Smiths' property located at 3505 Parkway Terrace, Bryan, Brazos County, Texas 77802 ("Property") during July 2024. The Policy includes Coverage A (Dwelling) $1,000,000 limit, Coverage B (Other Structures) $100,000 limit, Coverage C (Personal Property) $500,000 limit, Coverage D (Loss of Use) $200,000 limit, Ordinance or Law $100,000 limit, Limited Fungi $5,000 limit, Additional Replacement Cost

(Dwelling) $250,000, and other coverages and provisions. This Policy was fully paid and in effect at the time of the loss. Travelers Personal has admitted that it issued the Policy to David Smith and Misty Smith as Named Insureds, insuring the Property with coverage effective September 18, 2023 through September 18, 2024, and that Plaintiffs notified it of the water-damage claim on or about July 20, 2024 (see Travelers Answer, September 23, 2025, ¶¶5, 9). The loss, which occurred July 15–20, 2024, therefore occurred during the policy period.

25. The property damage occurred from July 15 through July 20, 2024, when the upstairs toilet supply line accidentally discharged water. The Policy covers "an accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning, or automatic fire protective sprinkler system or household appliance that causes damage to a building on the 'residence premises.'" The toilet supply line was a plumbing system on the residence premises, so the Smiths allege that the loss falls within this covered peril, subject to the Policy's terms and conditions.

26. The Smiths left the Property for a family trip on July 5, 2024, planning to return on July 30th. The Smiths and their family drove their pickup and camper from central Texas, to northern Virginia, and then on to Wisconsin. While in Wisconsin, the Smiths discovered that their house had been flooding for five days.

27. Data obtained after the loss indicated that water began escaping at approximately 3:00 p.m. on July 15, 2024, and continued until about 8:40 a.m. on July 20, 2024, when an HVAC technician discovered widespread standing water and shut off the supply. Approximately 23,675 gallons had entered the house; nearly all the 4,053-square-foot residence was affected.

28. Mr. Smith notified Travelers and filed the Claim at 9:09 a.m. on July 20. Travelers assigned claim number I8C4809 ("Claim") and July 20, 2024, 12:00 a.m. as the date of loss.

29. While filing the initial Claim, Travelers asked if they should contact a restoration vendor or the Smiths' behalf. The Smiths authorized Travelers' recommended vendor, PuroClean, to remove water and begin drying the Property. Travelers also communicated that an adjuster would be on-site to inspect the property within two or three days.

30. PuroClean arrived on site July 20 and began that work later that day. PuroClean began water extraction, dehumidification, and use of fans, but wet building materials, floor coverings, and contents remained in the Property.

31. Travelers assigned Ramseier, who had been licensed as an adjuster since September 2021, as principal adjuster. Travelers Personal has admitted that Ramseier "was assigned to investigate, evaluate, and adjust" the Claim (see Travelers Answer, September 23, 2025, ¶14).

32. The Smiths attempted to talk to Ramseier twice on July 20, but Ramseier did not contact the Smiths until two days later at 12:47 p.m. on July 22.

33. During the call on July 22, Ramseier set a date to inspect the Property on August 16, 2024 — 27 days after the Claim was filed and 32 days after the damage began.

34. Ramseier told the Smiths they would have to document each individual contents item in detail before Travelers would decide what to replace. Deeming this to be an overwhelming task, Mr. Smith contacted Ramseier's supervisor. Travelers responded by assigning Angie Smith to handle contents adjustment.

35. On July 24, 2024, the Smiths discussed Coverage D (Loss of Use) benefits with Travelers in order to pay for rental housing because the loss resulted in the "residence premises" where the insured resides was "not fit to live in." Based on experience Mr. Smith gained while remodeling two previous homes and his initial conversations about the damage, Mr. Smith communicated to Ramseier that the initial estimate of time to restore their home was at least 12 months.

36. As a follow-up to this conversation, Ramseier communicated to the housing provider that Loss of Use additional living expenses ("ALE") were approved for "approximately four months" based on an uninspected estimate.

37. Angie Smith called Mr. Smith on or about July 24, 2024, to discuss the contents items. Angie Smith separately told Mr. Smith that a service provider would collect and inventory the contents and scheduled a contents inspection for July 30.

38. On or about July 24, 2024, the Smiths asked Ramseier about possible mold associated with the prolonged water exposure.

39. PuroClean employee David Bonilla sent Ramseier photographs and reported that minimal visible mold was present in water-damaged areas only. By observation and statute, PuroClean saw no reason for a mold inspection report to be ordered and did not recommend a mold inspection.

40. Nevertheless, Ramseier recommended that the Smiths contact a mold hygienist and perform testing for potential mold damage.

41. On or about July 25, 2024, the Smiths contacted Travelers' ALE provider. Although the provider could not locate housing, the Smiths located potential rental housing themselves.

42. The Smiths returned to Bryan on July 28, 2024, and found extensive standing-water damage, wet bathrooms, wet floor coverings, and contents remaining in the Property. They documented the condition for Travelers.

43. On July 29, the Smiths elected to live in a trailer on the Property for approximately four weeks in order to be present on the property during the initial remediation. Even after that time, the Smiths continued to be present at the house on a regular basis.

44. On July 29, Choice Consulting conducted surface and air testing for mold.

45. On July 30, a contents restoration vendor began removing property for inspection, cleaning, and storage.

46. On July 30, the Travelers contents adjuster, Angie Smith, arrived to inspect the contents and immediately totaled around 20 or 30 items. The Smiths explained to Angie Smith that Mrs. Smith has a chronic neuromuscular disorder that requires a special bed and recliner to support health and life. To support the health needs of Mrs. Smith, Angie Smith authorized the replacement of the master bed and one recliner to help accommodate Mrs. Smith's health issues.

47. On Thursday August 1, PuroClean began removing wet sheetrock in the master bedroom but did not demolish the bathrooms and ceilings which sustained the worst damage or other areas where wet contents remained.

48. On August 2, Choice Consulting issued a report only finding mold on water-damaged materials and slightly elevated airborne mold in three of nine locations; the report also included a demolition and remediation protocol.

49. On August 3, Mr. Smith provided the mold report to Travelers and PuroClean.

50. On August 5, 2024, PuroClean notified the Smiths that PuroClean could not continue mitigation until the protocol specified in the mold report was completed. Since the local PuroClean franchise lacked a mold-remediation license, all PuroClean work stopped. Mr. Smith emailed Ramseier and David Bonilla of PuroClean to ask for a conference call. Mr. Smith expressed concerns that "… this is one of those situations that I am concerned could spiral out of control", "Since those samples were taken, the mold is continuing to grow", "… I would like documentation that we all agreed that the delays are unavoidable and the possible consequences of extended losses are acknowledged", and "I would like to do what we can to minimize the damage."

51. On August 7, 2024, Mr. Smith, Ramseier and David Bonilla of PuroClean had a conference call to discuss the situation. PuroClean left dehumidifiers operating for several weeks.

52. On August 8, 2024, contents adjuster Angie Smith transmitted the initial contents estimate. This estimate only contained 21 items, including items critical for Mrs. Smith's health needs.

53. Ramseier first inspected the Property on August 16, 2024—**27 days after the Claim was filed and 32 days after the damage began**. Ramseier did not visit or inspect the Property at any time before August 16, 2024; the July 30, 2024 visit was by contents adjuster Angie Smith and Restoration Cleaners.

54. Ramseier and another adjuster performed a cursory inspection, overlooked or disputed damage identified by the Smiths (for example, damage to the upstairs shower walls), and declined to treat photographs and videos of property exposed to Category 3 water as sufficient proof of damage. Ramseier also refused to consider replacement of contiguous or matching items, citing Travelers' internal adjusting policies as the justification. The detailed estimate history and related scope disputes are set out below.

55. On September 3, 2024, Travelers transmitted its first dwelling estimate, dated September 2, 2024, for $137,191.66.

56. The Smiths retained licensed public adjuster David Calliham of AMF Claims Consultants ("AMF"), who inspected the Property and prepared a pre-demolition estimate dated October 9,

2024, for $342,430.01. The AMF estimate was provided to Travelers, and the Smiths requested a second inspection. The estimate history and classification dispute are detailed below.

57. On October 21, 2024, Calliham and Mr. Smith met Ramseier for a second inspection. During that inspection, **Ramseier threatened physical violence and conditioned an ALE extension on the Smiths' personally assuming responsibility for remediation and accepting at least partial liability**; the specific threats and coercive conduct are detailed below.

58. As a response to the October 21 threats and ALE condition, Mr. Smith began demolition on October 24, 2024, taking time from his business, purchasing specialized supplies, using containment procedures, and protecting himself and the Property with negative HEPA air movers. He found ANSI/IICRC Class 4 (Bound) water trapped in cabinets, sheetrock, insulation, and other materials that remained wet three months after the Claim was filed; a contractor later assisted, and the work continued into January 2025.

59. Travelers issued an updated estimate on November 4.

60. On November 29, the Smiths submitted a disputed-items letter to Travelers.

61. In December Travelers elected to retain South Texas Restoration to prepare a comparative estimate.

62. Travelers issued an updated estimate on December 27, 2024.

63. In December 2024, the Smiths requested an ALE extension and supplied the reconstruction timeline Travelers required; the authorization history is set out below.

64. On or about January 8, 2025, Restoration Cleaners returned the Smiths household items. Travelers Personal has admitted that Restoration Cleaners picked up the contents in three separate trips beginning in August 2024, returned them more than five months later in early January 2025, and was paid $61,601.05 for collecting, cleaning, storing, and returning them (see Travelers Answer, September 23, 2025, ¶62). The Smiths were obligated to inspect thousands of items and report any damage within 30 to 45 days. Many of these items were found to be damaged and destroyed.

65. Since the original Travelers authorization for ALE was less than the time required to rebuild, the initial housing lease expired on February 28, 2025. On January 27, 2025, the Smiths' landlord decided to sell the rental house and declined to renew their lease, forcing the Smiths to find a second rental house. Although they secured a new ALE lease on February 10, 2025, the Travelers' ALE authorization on January 29, 2025, did not cover the full lease term.

66. Travelers issued the South Texas Restoration comparative and updated estimate on February 21, 2025.

67. On or about March 15, 2025, the Smiths moved into the second rental house.

68. On July 31, 2025, Travelers renewed the Policy. In spite of the fact that the Property value was greatly diminished, the renewal premium was $11,008.00, a 69% increase from $6,509.00 at the time of loss, compared with a 23% increase in average Texas homeowners' premiums during the same period.

69. On August 4, 2025, Travelers' consultant Carl Johnson of Riverstone Building and Consulting in Austin, Texas, reinspected the house. Travelers has not provided the Smiths any reports from this reinspection.

70. On November 10, 2025, Travelers authorized ALE through August 15, 2026; the dedicated ALE allegations below address the later administrative extension through the end of the Smiths' lease.

71. After the initial remediation to Travelers specifications was completed in January 2025, the house continued to exhibit a bad odor. The Smiths continue to explore how to remove these odors from the house and the Smiths have consulted with two specialized professionals to date. Options have included additional remediation as well as various treatments. In order to try to remove the odor, additional remediation was undertaken at the Smiths expense in January 2026. Following recommendations by the consulted experts, the additional remediation removed most of the sheetrock from the walls, more of the open-cell foam insulation, more water-damaged materials, and more of the flooring. Findings include additional water-damaged materials caused by water that had flowed horizontally, then vertically down from the second floor as well as

additional damage caused by water that had pooled under the flooring. Notably, the back entry area of the house was found to be holding significant amounts of ANSI/IICRC Class 4 (Bound) water damage under tile that Travelers refused to approve for removal. When that tile was removed, the area was found to contain enough residual moisture to cause a portion of the bad odor as well as sill plate rot in some of the walls. At the present time over 26 months after the damage occurred, it is still unclear how or if the remaining bad odor can be removed from the house. The Smiths continue to explore the possibilities for additional remediation of materials holding the bad odor including, but not limited to insulation, sheetrock, concrete, and other building materials.

72. Because Ramseier lives locally and had threatened violence during the Claim inspection, the Smiths remain concerned for their physical safety.

**B: Category A Conduct: Systemic Claims-Handling Failures**

**The 27-Day Inspection Delay**

73. During the initial Claim filing conversation on July 20, 2024, the Travelers representative informed Mr. Smith that the adjuster would visit the Property within two or three days. The Smiths were unable to schedule a conversation with Ramseier until Monday, July 22, 2024. During that conversation, Ramseier advised that his earliest inspection availability would be August 16, 2024 —27 days after the Claim was opened and 32 days after the damage began.

74. Given that the house had been standing in undiscovered Category 3 water for about five days with the air conditioning on vacation mode, it was especially important to take immediate action. Instead, a 27-day delay before the first inspection caused the Property to worsen rapidly and sustain significant additional damage during the delay. Proper and timely inspection and procedures would have resulted in an immediate removal of all contents, wet material demolition and removal, followed by intense drying and dehumidification.

**PuroClean's Constrained Scope**

75. Travelers recommended PuroClean as a preferred mitigation contractor and arranged for PuroClean to respond to the Property on July 20, 2024. Travelers paid PuroClean directly under a direct-payment arrangement between Travelers and PuroClean.

76. On July 20, 2024, the Smiths were required to sign an Authorization to Perform Services with PuroClean which included the provision "Customer (Smiths) authorizes Provider (PuroClean) to cooperate with the Insurer (Travelers) in its investigation of the loss".

77. When the Smiths arrived home on July 28, 2024, they found that PuroClean removed none of the wet sheetrock from the walls, only a portion of the baseboards and carpeting only where convenient, none of the tile, none of the bamboo flooring in the entry, wet carpeting in the upstairs office and bedroom, nor any of the contents.

78. When the Smiths asked why PuroClean had not removed all wet floor coverings, PuroClean indicated that Travelers either stated or implied that the remaining floor covering would only be cleaned, not replaced. Items had been standing in and/or saturated with Category 3 water since July 15th did not qualify as items to be immediately removed, a position Travelers confirmed through Ramseier during the inspection on August 16, 2024. Even though the remaining wet floor coverings were increasing the ongoing damage to the Property, PuroClean was unwilling to remove materials that Travelers might later decline to pay for.

79. Plaintiffs allege that Travelers thereby exercised practical control over the scope of the mitigation work that PuroClean was willing to perform, that materials saturated since July 15, 2024, were left in place as a result, and that those materials continued to degrade and release Category 3 moisture into adjacent assemblies causing additional damage to the Property and its contents. In addition, this constrained scope was due in part to the 27-day inspection delay that delayed proper investigation and resulted in wet materials remaining in the home that continued to degrade and contaminate adjacent portions of the Property and personal property items. IICRC S500 (Professional Standard and Reference Guide for Water Damage Restoration) sets forth that Category 3 water remediation should occur immediately starting with extraction, containment, and

contaminated material removal – ideally with 24 to 48 hours to help prevent further damage. The failure to follow industry guidelines resulted in a dramatic escalation of damage.

**The Knowing Misclassification of Water Damage as Microbial Damage**

80. The Choice Consulting report received on or about August 2, 2024, attributed the mold it identified to the water damage, identified mold on water-damaged building materials and contents, reported slightly elevated but not unusual airborne mold in three of nine sampled locations, and prescribed demolition and remediation procedures. The report identified no mold in any location that had not been damaged by water. This report is also consistent with the on-site observations of PuroClean.

81. Travelers classified the remediation prescribed by that report as "microbial" damage subject to the Policy's $5,000 Limited "Fungi" or Other Microbes Remediation limit, rather than as damage directly caused by the covered water loss and payable under the dwelling coverage. Travelers first applied that classification in its estimate dated September 2, 2024, and it has maintained the classification in every subsequent estimate.

82. That classification is inconsistent with the mold inspection report, PuroClean recommendations, and Travelers' own contemporaneous records. The same September 2, 2024, estimate that applied the microbial classification also classified the water as ANSI/IICRC Category 3. The mold assessment on which Travelers relied attributed all identified mold to the water loss.

83. On February 21, 2025, Arnulfo Escamilla of South Texas Restoration, Inc., a consultant engaged by Travelers, provided Travelers a comparative estimate that did not separate water-damage rebuild from microbial-only rebuild. In the Travelers estimate of February 21, 2025, Travelers knowingly ignored the comparative estimate of their own consultant by continuing to misclassify water damage as microbial damage. Ramseier acknowledged that fact in his email of February 21, 2025, in which he wrote: "The South Texas Restoration estimate did not separate the water damage rebuild from the microbial-only damage build. As discussed previously the rebuild for the microbial-only damage falls within the Limited 'Fungi' or Other Microbes Remediation additional coverage." In spite of the fact that Travelers knew that no "microbial-only" damage was

found, Travelers did not revise the classification. Instead, the estimate transmitted that day actually increased the amount assigned to the microbial classification from $29,408.97 to $32,268.37 (excluding the $2000 expense for the mold inspection report).

84. Inspection observations and the mold report attributed the mold growth to the water damage, and Travelers' September 2, 2024 estimate classified the loss as ANSI/IICRC Category 3 water. Further, during the October 21, 2024 inspection, Ramseier stated that the water damage was classified as Category 3 water. Despite that information, Travelers classified protocol-related remediation as separate “microbial damage” subject to the Policy’s $5,000 Limited “Fungi" or Other Microbes Remediation limit, rather than evaluating it as part of the covered water loss. Additional Coverage 16.d provides that, if covered loss or damage to covered property is not caused, in whole or in part, by “fungi" or other microbes, loss payment will not be limited by that Additional Coverage except to the extent that “fungi” or other microbes cause an increase in the loss; any such increase is subject to that Additional Coverage. The Special Provisions—Texas endorsement, Exclusion 11, further provides that the fungi, other microbes, or rot exclusion does not apply when those materials are located upon the portion of covered property that must be repaired or replaced because of direct physical damage resulting from a peril covered under the Policy. Travelers’ classification ignored these provisions and separated water-related remediation from the covered water damage.

**Travelers did not consider Ordinance or Law Coverage**

85. The Choice Consulting report contained a mold remediation protocol. Under Texas law, mold remediation performed for compensation in a project of the size described in that protocol must be performed by a licensed mold remediation contractor working from a written remediation protocol prepared by a licensed mold assessment consultant. Tex. Occ. Code §§ 1958.101(a), 1958.102(a)(2), (c), 1958.151 and 16 TAC §§ 78.100(e), 78.120(b), 78.58.

86. The Policy’s Additional Coverage 12, “Ordinance or Law,” provides up to 10% of Coverage A—$100,000—for increased costs incurred because enforcement of an ordinance or law requires construction, demolition, remodeling, renovation, or repair of a covered building damaged

by a Peril Insured Against; the coverage may also be used for related debris removal. The mold-remediation protocol was required by Texas regulations. Travelers failed to evaluate or apply Ordinance or Law coverage to the extent the mold protocol required construction, demolition, remodeling, renovation, repair, or related debris-removal costs attributable to the covered water loss. Travelers has never applied Ordinance or Law Coverage to any portion of the Claim, has never stated a Policy basis for declining to do so, and, on information and belief, performed no written analysis of the question. Travelers' estimates assign $0 to Ordinance or Law Coverage.

**Inadequate Estimates**

87. Travelers transmitted the following dwelling estimates and each figure is taken from the estimate itself. Travelers knowingly provided estimates that withhold loss payments such that the Property cannot be restored to a pre-loss condition. Travelers was provided with a video of the Property taken on July 20, 2024, that illustrated the extent of damage to the Property. Travelers was aware that the damage had been ongoing and undiscovered for about five days and that the air conditioning had been in vacation mode. Travelers should have reasonably known the scope and type of damage to expect with such a loss. Travelers was aware that the Property had been extensively remodeled around 2010 which included high-quality replacement of sheetrock, insulation, light fixtures, cabinets, countertops, floor coverings, plumbing and fixtures, electrical, appliances, doors, woodwork, roofing, windows, paint, audio/visual, networking, heating, air conditioning, and ductwork. Despite this knowledge, Travelers' estimates do not restore these items to their pre-loss condition. Travelers knew that the water damage was classified as ANSI/IICRC Category 3 water damage and documented this knowledge in this estimate dated September 2, 2024. In spite of this knowledge, the estimates prior to November 1, 2024, did not reflect Category 3 water damage remediation and the estimates of November 1, 2024, and later include only partial accommodation for Category 3 water damage. Travelers only obtained an ITEL report on one type of flooring, the results showing that a match was not found. Depreciation in the estimates is inconsistent and debatable.

88. On September 3, 2024, Travelers transmitted the first dwelling estimate, dated September 2, 2024, totaling $137,191.66, including $31,499.48 misclassified as microbial, $2,000 correctly classified as microbial, and $44,950.95 of depreciation.

89. On October 3, 2024, Travelers provided an updated dwelling estimate dated October 1, 2024, increased by $167.31 and totaling $137,358.97, including $31,499.48 misclassified as microbial damage, $2,000 correctly classified as microbial, and $44,950.95 of depreciation, thus confirming Travelers' commitment to the scope, value, and classification of coverage.

90. Plaintiffs retained licensed public adjuster David Calliham of AMF Claims Consultants, who issued a pre-demolition dwelling estimate on October 9, 2024, in the amount of $342,430.01. This estimate was forwarded to Travelers.

91. On November 4, 2024, Travelers provided an updated dwelling estimate dated November 1, 2024, increased by $28,797.35, and totaling $166,156.32 including $29,411.14 misclassified as microbial damage, $2,000 correctly classified as microbial, and $48,609.51 of depreciation, thus re-confirming Travelers' commitment to the scope, value, and classification of coverage. Approximately half of the increase of this estimate is allocated to mitigation and half to reconstruction.

92. On November 29, 2024, the Smiths sent a dispute letter to Travelers supported by an updated dwelling estimate by AMF in the amount of $447,667.87. This dispute letter was provided to Travelers.

93. Licensed public adjuster David Calliham of AMF Claims Consultants issued an updated dwelling estimate on December 13, 2024, in the amount of $464,700.38.

94. On December 27, 2024, Travelers provided an updated dwelling estimate dated December 27, 2024, increased by $36,225.04, and totaling $202,381.36 including $29,408.97 misclassified as microbial damage, $2,000 correctly classified as microbial, and $50,485.93 of depreciation, thus re-confirming Travelers' commitment to the scope, value, and classification of coverage. Most of the increase of this estimate is a payment to PuroClean under Travelers direct payment agreement for partners. The remaining increase is allocated to miscellaneous small reconstruction.

95. On February 21, 2025, after engaging consultant Arnulfo Escamilla of South Texas Restoration Inc., Travelers provided an updated dwelling estimate increased by $6,450.43 and totaling $208,831.79, including $32,268.37 misclassified as microbial damage, $2,000 correctly classified as microbial, and $51,172.10 of depreciation. The microbial misclassification increased from $29,408.97 to $32,268.37—meaning Travelers actively added new items to the microbial category after the microbial classification had been formally disputed.

96. Licensed public adjuster David Calliham of AMF Claims Consultants issued an updated dwelling estimate on March 17, 2025, in the amount of $476,561.21.

97. Licensed public adjuster David Calliham of AMF Claims Consultants issued a dwelling estimate on August 15, 2025, in the amount of $493,009.31.

98. The current dwelling restoration estimate as of September 16, 2026, is $807,656.91 comprised of sources that include Travelers' estimate from February 21, 2025, AMF estimate from August 15, 2025, and additional damages from 2026, adjusted for pricing increases in materials and labor.

99. Travelers' last dwelling estimate of $208,831.79 is approximately 25.9% of the total amount necessary to restore the Property to its pre-loss condition. Travelers has paid $130,352.49 Coverage A (Dwelling) benefits to date.

100. Contents estimates changed regularly as both the Smiths and Restoration Cleaners updated the inventory, descriptions, and price lists. Payments from those estimates were typically slow in coming and were a mix of estimated ACV, depreciation, and actual price. Reimbursement processes were used in most cases. The initial contents estimate was transmitted by contents adjuster Angie Smith on August 8, 2024.

**Systemic Delay and Non-communication**

101. On November 29, 2024, Plaintiffs sent Travelers a detailed disputed-items letter with explanations and photographs. Travelers Personal has admitted receiving Plaintiffs' Claim-related correspondence on or about November 29, 2024 and retaining South Texas Restoration, Inc. to provide professional services in connection with its investigation, evaluation, and adjustment of

the Claim (see Travelers Answer, September 23, 2025, ¶48). Travelers did not respond substantively to the disputed-items letter until February 21, 2025, an interval of eighty-four days.

102. The estimate transmitted on or about February 21, 2025, represents the last substantive communication from Travelers to Plaintiffs regarding the merits of the Claim (excluding ALE administrative matters). As of the filing of this Complaint, over eighteen months have elapsed since Travelers' last substantive communication regarding coverage. Travelers has provided no revised estimate, no coverage letter, no settlement proposal, and no explanation of its coverage position during this period—despite the pendency of this litigation and Plaintiffs' formal dispute of the coverage classification.

103. During this eighteen-month silence, Travelers was not passive. On or about August 4, 2025, Travelers' consultant Carl Johnson of Riverstone Building and Consulting in Austin, Texas reinspected the Property. Travelers has not provided Plaintiffs with any reports or findings from this reinspection. Travelers selectively engaged on administrative matters (ALE extensions) while maintaining complete silence on the Claim's merits—demonstrating deliberate non-communication rather than inadvertent neglect.

**ALE Underauthorization and Characterization**

104. Coverage D—Loss of Use applies when a loss covered under the Property Coverage Section makes the part of the "residence premises" where the insured resides "not fit to live in" and covers any necessary increase in living expenses. Payment is for the lesser of: (a) the shortest time required to repair or replace the damage or settle the household elsewhere if the insured permanently relocates; or (b) 24 months.

105. On July 24, 2024, ALE Solutions informed the Smiths that Travelers had approved a rental for "approximately 4 months." In a text message that day Ramseier wrote, "we will establish an initial period of restoration based on the damage and preliminary timeline for repairs to be completed." At that time, based on conversations and pictures from PuroClean and available photographs he should have reasonably known that the restoration timeline was at least 12 months.

106. On July 29, 2024, Travelers extended the ALE authorization to approximately six months (August 19, 2024 to February 28, 2025).

107. During the August 16, 2024 inspection, Mr. Smith asked Ramseier's opinion on how long rebuilding would take after reconstruction started. Ramseier answered that he expected eight months after demolition was complete, thus confirming that from the beginning of the Claim Ramseier knew that the shortest time reasonably required to repair or replace the damage exceeded the initial ALE authorization. Despite this knowledge, Travelers did not extend their ALE authorization at that time.

108. During the October 21, 2024 inspection, Ramseier communicated that any additional ALE authorizations would be "hard to grant" unless the Smiths re-started demolition and remediation "next week or you start in two weeks" requiring the Smiths to bear any unapproved expenses associated with a) authorized demolition and remediation and b) demolition, remediation, and reconstruction required by the mold report.

109. On January 27, 2025, because of the shortened initial authorization, the Smith's first landlord did not renew the Smiths' lease, forcing the Smiths to rapidly locate another rental.

110. Travelers required the Smiths to submit an estimated reconstruction timeline as a condition of continued ALE authorization. Travelers Personal has admitted that when Plaintiffs requested an ALE extension in December 2024, it required a time estimate from Plaintiffs' reconstruction contractor and approved the extension only after Plaintiffs supplied it (see Travelers Answer, September 23, 2025, ¶51). Only after the Smiths had restarted demolition and remediation and supplied an eight-month reconstruction estimate, on January 29, 2025, Travelers approved ALE authorization through November 30, 2025 (later extended to December 15, 2025). The Smiths were unable to obtain any lease limited to the authorized period and incurred lease obligations extending beyond it.

111. On or about August 11, 2025, the Smiths requested an ALE authorization extension through August 15, 2026. Travelers did not act on the request until November 10, 2025, an interval

of approximately three months. The Smiths allege this authorization history and delay as claims-handling facts.

112. In spite of Travelers ALE authorization delays, on July 22, 2026, Travelers extended the ALE authorization through January 15, 2027. This authorization constitutes an extension beyond the 24-month Policy limit for Coverage D (Loss of Use).

113. Travelers has declined to reimburse electricity charges attributable to operating drying equipment at the Property, replacement clothing purchased while Plaintiffs' clothing was inventoried and unavailable, and some food expenses incurred during periods when Plaintiffs had no access to a kitchen. Those items total approximately $4,527.00 of the unpaid ALE expenses.

**C: Category B Conduct: Threatening and Coercive Acts**

**The October 21, 2024 Threats of Physical Violence**

114. On October 21, 2024, beginning at approximately 10:00 a.m., David Calliham and Mr. Smith met Ramseier at the Property for a second inspection to discuss the estimates. The stated purpose of the meeting was to reconcile Travelers' September 2, 2024, estimate with the AMF estimate of October 9, 2024, and to discuss the Choice Consulting report and additional living expenses.

115. Mr. Smith lawfully recorded the entirety of this conversation under Texas law, which permits recording by a party to the communication. Tex. Penal Code § 16.02(c)(4).

116. Mr. Smith and David Calliham were calm throughout the encounter. Neither raised his voice, made any threat, or made any physical gesture toward Ramseier. Neither was hostile or combative at any point. In response to Ramseier's threats, Mr. Smith immediately felt fear and a dread of impending loss. Mr. Smith responded to this fear by adopting a calming demeanor with a neutral posture, empathic and nonjudgemental, smiling, deflecting comments with light-hearted humor in an attempt to de-escalate the situation that caught him by complete surprise.

117. During a discussion about carpeting and tile scope, the conversation took a threatening turn when Ramseier threatened physical violence as the resolution to the insurance scope dispute. Ramseier made it clear that he was ready to provide a "free hospital ride" and use his fists if

necessary to bring the insured and public adjuster into agreement with Ramseier's estimates. Ramseier doubled down by making two threats, underscoring his point.

118. Ramseier extended the nature of the threats by recounting, in the first person, another claim in which Ramseier responded to a perceived “aggression” from a different public adjuster with a threat to throw the public adjuster off the roof and kill him. Ramseier's story demonstrated that he is predisposed to meet a perceived dispute with overwhelming physical force—a behavior he attributed to his ten years as a police officer where he was experienced with "ten years putting my hands on people." Ramseier emphasized these threats by relaying the story of threatening to kill someone ("And like he looked at me and he knew I wasn't kidding about it…"). Ramseier was communicating that these threats were deadly serious.

119. Ramseier's threats of physical violence to coerce insurance settlement acceptance are extreme and outrageous conduct that exceeds all bounds tolerated by civilized society and caused the Smiths severe emotional distress. These threats immediately created a sense of fear and the dread of impending loss.

120. In this Claim, Travelers holds the dominant position of power over the Smiths and is in a position to materially harm the Smiths. Travelers' and Ramseier’s actions have gone beyond mere bullying tactics and high pressure methods and have extended to extortionate threats within the insurer-insured relationship. Travelers knew that Mrs. Smith has a neuromuscular disorder that requires special care and knew or should have known of her particular susceptibility to emotional distress.

**The Extortionate Conditioning of ALE**

121. During the same October 21, 2024 inspection, Ramseier threatened to withhold or deny continued ALE unless the Smiths agreed to immediately assume personal responsibility for remediation.

122. Coverage D provides for the necessary increase in living expenses when a covered loss makes the part of the “residence premises” where the insured resides “not fit to live in,” with

payment limited to the lesser of the shortest time required to repair or replace the damage (or settle the household elsewhere if the insured permanently relocates) or 24 months.

123. Ramseier communicated that any additional ALE authorizations would be "hard to grant" unless the Smiths re-started demolition within one or two weeks requiring the Smiths to bear any unapproved expenses associated with a) authorized demolition and remediation and b) demolition, remediation, and reconstruction required by the mold report. Travelers had already acknowledged Loss of Use coverage and authorized ALE through the end of February 2025. Ramseier's statement was not a coverage determination and was not accompanied by any Policy basis, any request for information, or any reservation of rights. This statement was a threat to discontinue or deny benefits already accepted as payable unless Plaintiffs capitulated. Later ALE extensions were only granted after the Smiths complied (see Travelers Answer, September 23, 2025, ¶51).

124. This demand was not a good-faith coverage determination. It was an extortionate condition imposed on the Smiths who: (a) had no alternative housing available; (b) could not afford to self-fund housing without ALE; (c) had a medically vulnerable family member (Mrs. Smith) who required stable and suitable housing for healthcare; (d) were in the midst of an active coverage dispute in which Travelers had refused to fund the very remediation Travelers now coerced as the Smiths responsibility; and (e) had been systematically stripped of financial alternatives by Travelers' prior conduct (denied coverage, inadequate payments, shortened ALE approvals).

125. Because of the vulnerable position of the Smiths, personally hiring a certified mold remediation company was not possible. Ramseier knew that the Smiths had no choice but to personally perform the coerced remediation.

126. The Smiths were coerced into accepting this course of action by their fear of losing ALE benefits and thus losing a place to live. By agreeing to comply, the Smiths gave property concessions (personal labor on their house), money concessions (paying for expenses that should have been covered by Travelers), and time concessions (loss of income-generating capacity) to the benefit of Travelers.

127. As of October 21, 2024, Travelers improperly withheld Policy benefits, denying remediation and reconstruction claims under two separate policy provisions (Dwelling Coverage and Ordinance or Law Coverage) and threatening to terminate or deny further ALE that it had already authorized, subject to Coverage D's terms. These acts went beyond an ordinary dispute over benefits and constituted the alleged extortionate threat directed at the Smiths. The threat to make the Smiths homeless caused severe emotional distress.

**The Coerced Self-Remediation and Its Consequences**

128. In response to Travelers' extortionate threat, the Smiths complied with Travelers' demands. Beginning on October 24, 2024, Mr. Smith took off work and bought tools, negative pressure HEPA fans, plastic, tape, personal protective equipment, and other items necessary to personally complete the remediation. Mr. Smith was required to perform tasks that should have been completed by PuroClean. He used best practices to seal off rooms and used negative HEPA air movers to control mold and debris. A few weeks later, Mr. Smith located a contractor to assist him with demolition and remediation.

129. As Mr. Smith removed damaged items, he found Class 4 (Bound water) in cabinets, sheetrock, insulation, and other items that were still wet three months after the Claim had been filed—demonstrating that the property had continued to deteriorate throughout the period of halted remediation.

130. On January 17, 2025, the Smiths had the opportunity to sell their only other real estate at an offer price that was significantly below appraised market value. Because of the financial duress of personally completing remediation and potential pending loss of Coverage D for living expenses, the Smiths were compelled to accept the purchase offer in order to provide for living expenses going forward—a direct economic consequence of the extortionate threats.

131. At the time of the October 21, 2024, threats and the coerced self-remediation that followed, both David Smith and Misty Smith were actively engaged in independent business pursuits.

132. Mr. Smith is a technology entrepreneur and patent holder. He holds a portfolio of twenty-one (21) issued United States patents related to computing, data processing, and related

technologies. Before the events giving rise to this Complaint, Mr. Smith was actively engaged in multiple concurrent business ventures, including: (a) development of data-center hardware systems requiring the construction of models, physical prototypes, and demonstration units; (b) development of multiple commercial software products and services; and (c) licensing of his patent portfolio to companies operating in the data-center sector, an industry in which potential licensees include companies with collective market capitalizations exceeding ten trillion dollars. These ventures required sustained, full-time engineering and business-development effort over multi-month and multi-year development cycles and were on a trajectory to generate substantial revenue through product sales, licensing fees, and related commercial activity.

133. Mrs. Smith operates an independent small business in art production and greeting-card design, creation, and sales. Before the events giving rise to this Complaint, Mrs. Smith was actively producing, marketing, and selling original artwork and greeting cards, generating independent business revenue from those activities.

134. From the date of loss in July 2024 through October 20, 2024 ("Period 1"), both Mr. and Mrs. Smith's business pursuits were partially, but not completely, interrupted by the water loss and its immediate aftermath: Mr. Smith completed only limited business travel, and Mrs. Smith's greeting-card production and shipping, which must occur in August and September of each year, was largely interrupted. Plaintiffs do not claim Period 1 business losses as damages under any count of this Complaint. From October 21, 2024 through early April 2025 ("Period 2"), and from April 2025 through approximately August 2026 ("Period 3"), both Smiths' business pursuits were brought to a near-complete halt for approximately twenty-two months as a direct and proximate consequence of Defendants' conduct, as described below. Only beginning in approximately August and September 2026 have the Smiths begun to make meaningful progress in resuming their business pursuits. The specific nature, identity, financial projections, and commercial details of these business opportunities contain proprietary and competitively sensitive information that cannot be disclosed in this public filing without causing irreparable competitive harm to Plaintiffs. Plaintiffs will establish the full scope and value of these business opportunities through evidence

at trial, including expert testimony, and if commercially necessary, through proceedings under seal or subject to a protective order entered pursuant to Federal Rule of Civil Procedure 26(c).

135. The diversion of Mr. Smith's time, labor, financial resources, and professional capacity away from these business pursuits during Periods 2 and 3 resulted from four concurrent causal mechanisms, each independently traceable to Defendants' conduct beginning October 21, 2024, including the racketeering pattern:

(1) *Direct labor diversion.* The extortionate conditioning of ALE on October 21, 2024, coerced Mr. Smith into personally taking responsibility and performing demolition and remediation of the Property beginning October 24, 2024, and continuing into January 2025. During this period, Mr. Smith was required to purchase tools and equipment, construct containment, operate HEPA filtration, and perform physical demolition work — labor that professional contractors would otherwise have performed had Travelers funded the remediation it had refused to cover. This period of coerced manual labor directly displaced months of engineering, product development, prototype construction, and licensing activity.

(2) *Caregiving diversion.* The threats of physical violence and their communication to Mrs. Smith precipitated four near-fatal paralysis episodes (Injury E) between December 20, 2024 and March 10, 2025. During and after each episode (Period 2), and on a full-time basis from April 2025 through approximately August 2026 as the consequences of those episodes persisted and worsened (Period 3), Mr. Smith has been required to serve as Mrs. Smith's primary caregiver, monitoring her condition, managing her medical needs, and being physically present to respond to physical needs and potential respiratory failure. This caregiving responsibility — which did not exist at this level before Defendants' threats — consumed substantially all of the time and cognitive capacity that would otherwise have been directed toward business pursuits during Period 3 (Injury S).

(3) *Financial resource impediment and diversion.* The racketeering pattern forced the Smiths to divert capital from business investment to self-funded remediation costs (Injury I) and compelled the below-market sale of their only other real property (Injury H) to fund living expenses. Capital that would have been available for prototype development, demonstration systems, patent

prosecution and maintenance, business travel, and product-launch expenses was instead consumed by costs that Travelers was contractually obligated to bear.

(4) *Time and capacity diversion from claims management and litigation.* The racketeering pattern and Travelers' eighteen-month silence on the Claim's merits required Mr. Smith to devote hundreds of hours to managing the Claim dispute, coordinating with the public adjuster, documenting damages, managing two forced relocations, and preparing this litigation — time drawn directly from his business pursuits. During Period 2, these demands included processing thousands of contents items returned from Restoration Cleaners, preparing new contents estimates, and a last-minute pack-up and move to another residence. The diversion of time has rendered the tasks of funding, software development, marketing, and patent licensing to a virtual standstill.

136. Mrs. Smith's art and greeting-card business was independently curtailed by a direct causal mechanism: the threats of physical violence caused severe emotional distress that triggered near-fatal paralysis episodes (Injury E), which physically incapacitated Mrs. Smith during Period 2 and, through the continuing consequences of those episodes, substantially impaired her capacity to create, produce, market, and sell artwork and greeting cards throughout Period 3. Because her greeting-card business depends on production and shipping in August and September, that incapacity caused the loss of her 2025 selling season and continued reduced capacity into 2026. This loss is a loss of earning capacity resulting from bodily injury (Injury T) and is a direct consequence of Defendants' tortious conduct, not of the denial of policy benefits. Plaintiffs do not claim the interruption of Mrs. Smith's 2024 selling season, which occurred during Period 1.

137. The two-year delay has caused compounding harm beyond the lost revenue during the delay period itself. Product-development and patent-licensing opportunities are time-sensitive: technology markets evolve, competitive windows close, patent terms expire, and first-mover advantages are lost. Work on Mr. Smith's data-center technology that should have commenced approximately two years ago has only recently begun. The full extent of the consequential harm from this delay — including lost first-mover advantage, expired licensing windows, increased

development costs due to technology evolution, and the time-value of delayed revenue — will require expert analysis to quantify and will be established at trial.

**D: Category C Conduct: Fraudulent Inducement Regarding the Mold Report**

138. On or about July 24, 2024, Mr. Smith had conversation in which he asked Ramseier about possible mold growth associated with the prolonged water exposure. PuroClean employee David Bonilla sent Ramseier photographs and reported minimal visible mold in water-damaged areas only. By observation and statute, PuroClean saw no reason for a mold inspection report to be ordered and did not recommend a mold assessment.

139. Ramseier nonetheless recommended that the Smiths retain a mold assessment consultant.

140. Mr. Smith had additional conversations with Ramseier over the course of the next days that included discussions about the mold assessment. Ramseier told Mr. Smith that any mold caused by the water damage was a "moot point," because mold caused by the water loss would be covered by dwelling benefits provided as a result of the water damage loss.

141. These conversations omitted facts that made the statements misleading: Ramseier did not disclose that a mold assessment report would contain a remediation protocol; that a protocol, once issued, would require licensed remediation before further mitigation could proceed; and that Travelers would treat work prescribed by that protocol as "microbial" remediation subject to the $5,000 endorsement limit rather than as water-damage remediation payable under the dwelling coverage.

142. Falsity when made: the statements conveyed that a mold assessment was necessary and the classification of water-caused mold would not affect what Travelers paid.

143. Having affirmatively recommended a mold inspection while representing that water-caused mold was a "moot point," Travelers created a duty to disclose material facts in its possession, including that a mold-protocol would legally halt water mitigation by PuroClean and that Travelers intended to treat protocol-mandated water-damage remediation as uncovered "microbial" work. Travelers had superior knowledge of the legal effect of a mold protocol and of

its internal classification posture, and its half-truths misled Plaintiffs into a costly detour they would not have taken had the full facts been disclosed.

144. The Smiths trusted Travelers to make good-faith recommendations and followed Travelers' recommendation. Relying on these statements, the Smiths retained Choice Consulting on July 26, 2024 for a mold assessment to be performed on July 29, 2024.

145. The mold inspection report did not find any physical mold damage in locations that were not damaged by water. While three of the nine mold content air samples found slightly elevated mold content, the report did not find any unusual or concerning mold content in the air samples. The mold inspection report contained a mold remediation protocol that by Texas regulations must be performed by a licensed mold remediator.

146. PuroClean halted mitigation on August 5, 2024 and could not continue until the mold remediation protocol steps were completed by a licensed remediator. Because Travelers refused to pay for any mitigation called for in the mold inspection report—even though the only mold findings resulted from water damage—all remediation work stopped. The house condition worsened for the next 11 weeks.

147. During the second inspection on October 21, 2024, a discussion took place about obtaining a second opinion from another mold hygienist. When asked if Travelers would rely on the second opinion, Ramseier stated that Travelers would review the report. However, if Travelers did not agree that the second mold inspection report was factual or if Ramseier's supervisory chain believed that even though the second mold inspection report was correct, they still might reject the report because the "optics" might not be right for Travelers ("I know a hundred percent it's going to get pushed up for review given the situation and the optics of it, so I may get overturned somewhere along the ladder"). Ramseier stated that Travelers might decline to accept a second mold inspection report, not based on the findings of the second mold inspection report, but instead based on business risk: "some person seven levels above me is going to make a business decision about risk of the company and all those things I talked about earlier …".

148. The Smiths were placed in a dilemma created by Travelers' misrepresentation of the Policy terms. According to Travelers' misrepresentations, the Smiths were required to commit approximately $50,000 to $70,000 ($37,897.21 for remediation + rebuild expenses that were not estimated) in out-of-pocket expenses before any additional mitigation work could continue. But for Travelers' fraudulent recommendation of the mold inspection, the Smiths would not have obtained the report, the statutory protocol would never have been triggered, and PuroClean would have continued remediation without interruption.

**E: Independent Injuries to Health**

149. Mrs. Smith has a rare neuromuscular condition (NIH classification) known as Normokalemic Periodic Paralysis, a neuromuscular condition in which skeletal muscle function is episodically impaired. Sometimes symptoms are mild; sometimes the symptoms are significant skeletal muscle paralysis such that it is impossible to stand or move any part of the body. In extreme cases, the condition affects respiratory muscles, making breathing nearly impossible.

150. Travelers knew of Mrs. Smith's neuromuscular disorder. Travelers' contents adjuster, Angie Smith, was told of it during the July 30, 2024, contents inspection and authorized replacement of the medically necessary bed and recliner Mrs. Smith uses because of the condition.

151. On four occasions—December 20, 2024; January 15, 2025; February 20, 2025; and March 10, 2025—Mrs. Smith experienced Periodic Paralysis episodes so severe that her breathing muscles became compromised and asphyxiation and death were imminent. Each episode lasted 30 to 60 minutes and was witnessed by Mr. Smith and their daughter. During the episodes, she experienced hypoxia and hypercapnia sufficient to potentially cause some measure of permanent brain injury, and each episode was nearly fatal. To the extent prior filings stated otherwise, the March 10, 2025 episode is correctly alleged herein.

152. This was a dramatic escalation from her baseline of approximately one such episode every four years to one every 35.25 days—a forty-one-fold (41x) increase in frequency during the period of Defendants' most extreme conduct.

153. Plaintiffs allege that emotional distress can precipitate episodes in patients with Mrs. Smith's condition, that the frequency and severity of her episodes increased following the October 21, 2024, encounter, and that the distress caused by the threats made that day was a proximate cause of that increase.

154. Before October 21, 2024, the Smiths believed Travelers was acting as a cooperative partner, the stress and Mrs. Smith's symptoms were manageable. Defendants' threats of physical violence and coerced loss of housing then materially and dramatically increased the stress associated with the Claim; those threats were the predominant stressors during the relevant period—at least an order of magnitude greater than the normal stress of a catastrophic loss.

155. Even if Travelers had paid the Claim in full on October 22, 2024, the threats made on October 21 would still have triggered the fear and the resulting paralysis episodes—because payment of money does not eliminate fear of physical violence. These paralysis episodes constitute an independent physical injury caused by Defendants' tortious acts, not by the denial of policy benefits.

156. The effects of the severe emotional stress from the threats continued to grow over the weeks and months following the threats. Medical treatment for the consequences of these near-death episodes is ongoing, including evaluation and diagnosis of continuing symptoms and diagnosis of additional symptoms and other stress-related health issues that have arisen for the Smiths.

157. Plaintiffs do not seek recovery in this action for generalized anxiety arising from the pendency of the coverage dispute, or for distress arising from the disruption of moving between rental residences. Those matters are pleaded only as context.

**F: Payments and Current Status**

158. Travelers has paid $405,866.03 to date on this Claim, broken down as follows: $130,352.49 under the dwelling coverage; $145,655.06 under the personal property coverage; and $129,858.48 under the additional living expense coverage.

159. Based on current estimates — which remain preliminary because reconstruction has not commenced and contractor bidding is incomplete — the direct expenses outstanding are

$677,304.42 Coverage A (Dwelling), $276,805.43 Coverage C (Personal Property), and $24,138.78 Coverage D (Loss of Use). Assuming a move-in to a restored house in January 2028, the Smiths anticipate an additional $150,144.00 Loss of Use expenses required for ongoing living, housing, and moving expenses from October 2026 until the dwelling is restored to livable condition, currently projected to be twelve months after the resolution of this matter. These amounts will likely increase in costs for contracting, labor, materials, contents, rental, utility, storage costs, and increasing scope.

160. Plaintiffs claim not less than the outstanding amount shown above, together with the additional living expenses that will accrue until the Property is restored and Plaintiffs can reoccupy it. Plaintiffs will supplement these figures through disclosures under Federal Rule of Civil Procedure 26, including as investigation, contractor bidding, and restoration refine the estimates currently available, and, if the amount changes materially, by amendment.

161. Since the beginning of the claim, Travelers has only paid Coverage A (Dwelling) cash in-hand benefits of $85,893.40 for the demolition and restoration of the Smiths dwelling. The funds presently available to Plaintiffs are insufficient to commence reconstruction of a residence of this size and finish level, and reconstruction has therefore not begun. Since the beginning of the claim, Travelers has only paid Coverage C (Personal Property) cash in-hand benefits of $84,054.01 in the form of reimbursements for personal property replacement. Cash-in-hand is less than replacement cost estimates ("RCV") due to depreciation, direct payment to vendors, public adjuster commissions, and mortgage hold-backs.

**G: Injury Definitions and Classification**

162. As used throughout this Complaint, the following defined injury labels identify each discrete compensable harm, organized by the conduct category that caused it. The term "independent injury" refers to harm that satisfies the independent-injury requirement first articulated in *Republic Insurance Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995), and reaffirmed in *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 499–500 (Tex. 2018): an injury caused by the insurer's conduct that does not flow from or depend on the denial of policy benefits. Harm

that would persist even if the Policy benefits were paid in full is independent of the coverage outcome and is separately compensable in tort. Contract damages (Injury A) are not "independent injuries" under *Stoker*/*Menchaca* but are recoverable under the Policy itself. Property-damage injuries (Injuries B, C, D) are independent injuries to the Property caused by Defendants' negligent claims handling, not by the original covered peril. Economic losses from Category B conduct (Injuries G, H, I) are independent because they are caused by independently tortious conduct — extortion and threats of physical violence — not by the denial of policy benefits. These injuries would persist even if all Policy benefits were paid in full: payment of money does not undo the coerced diversion of labor (Injury G), the duress-driven property sale (Injury H), or the out-of-pocket costs incurred under threat of violence (Injury I). Economic losses from Category C conduct (Injuries K, L) are independent because they are caused by Travelers' fraudulent inducement — an independently tortious act — not by any coverage determination; the mold-inspection cost and opportunity cost of the mold-report path would have been incurred regardless of whether Policy benefits were ultimately paid. Injury J (public adjuster fees) is a consequential economic loss flowing from the conduct that gives rise to Injury A; it is recoverable as consequential contract damages and as actual damages under Chapter 541 and the DTPA, and is not asserted as an independent injury. Injury R (increased medical expenses) is an economic consequence of independently tortious conduct (the threats that caused Mrs. Smith's paralysis episodes) and is independent for the same reason as Injuries G, H, and I. The independence of the physical and emotional injuries (Injuries E, F, M, P) is addressed in the individual count allegations below. The Texas Supreme Court acknowledged in *Menchaca* that "a successful independent-injury claim would be rare, and we in fact have yet to encounter one." 545 S.W.3d at 500. The conduct alleged in this Complaint—audio-recorded threats of physical violence and death by an insurer's adjuster during a claims inspection, causing near-fatal medical episodes in a medically vulnerable insured—represents precisely the kind of extreme act that both *Stoker* and *Menchaca* contemplated.

The defined injuries are:

**Injury A — Unpaid Policy Benefits.** The economic loss of Policy proceeds wrongfully withheld by Travelers, presently estimated at $978,248.64 plus $150,144.00 in estimated additional living expenses, subject to applicable Policy limits. This is a contract injury, not an independent injury under *Stoker/Menchaca*.

**Injury B — Additional Property Deterioration (Mold-Report Halt).** The physical worsening of the Property during the approximately 11-week period (August 5 through late October 2024) when all remediation was halted because Travelers refused to pay for the mold remediation protocol. This is an independent injury to the Property caused by Defendants' claims handling, not by the original water loss.

**Injury C — Additional Property Deterioration (Inspection Delay).** The physical worsening of the Property during the 27-day period (July 20 through August 16, 2024) before Ramseier's first inspection, during which inadequate remediation scope was authorized. This is an independent injury to the Property caused by the inspection delay.

**Injury D — Additional Property Deterioration (PuroClean Scope Constraints).** The physical worsening of the Property caused by wet materials (sheetrock, carpeting, bamboo flooring, tile) left in place due to Travelers' influence over PuroClean's remediation scope. This is an independent injury to the Property caused by Travelers' constraining of the contractor.

**Injury E — Mrs. Smith's Paralysis Episodes.** Four near-fatal episodes of respiratory paralysis (December 20, 2024; January 15, 2025; February 20, 2025; March 10, 2025) caused by stress-induced biochemical depletion of Mrs. Smith's neuromuscular function, and their medical consequences including hypoxia, hypercapnia, possible permanent brain injury, and ongoing medical treatment. This is an independent physical injury: the threats of violence were the predominant cause (at least an order of magnitude greater than other stressors), and the episodes would occur even if the Policy benefits were paid in full because payment does not eliminate fear of physical violence.

**Injury F — Fear of Physical Violence.** The ongoing fear for physical safety experienced by both David and Misty Smith as a result of Ramseier's threats of bodily harm and his recounting of a

prior death threat. This is an independent injury: fear of physical assault exists regardless of the coverage outcome.

**Injury G — Lost Business Income.** Income Mr. Smith lost from approximately October 24, 2024 through January 2025 when Ramseier's extortionate conditioning of ALE coerced him to divert his labor from his own business pursuits — including software development, product development, and patent licensing — to personally perform demolition in a contaminated house. This is a quantifiable economic loss to Mr. Smith's business consequential to the coercion. Income lost during Mr. Smith's later full-time caregiving is claimed separately as Injury S.

**Injury H — Below-Market Property Sale.** The difference between fair market value and the sale price of the Smiths' other real estate, which they were compelled to sell at a below-market price due to the financial duress of personally funding remediation under the extortionate demand. This is a quantifiable economic loss consequential to the coercion.

**Injury I — Out-of-Pocket Remediation Costs.** The tools, equipment (negative pressure HEPA fans, plastic, tape, personal protective equipment), and contractor costs Mr. Smith purchased and incurred to personally perform remediation under the extortionate demand. This is a quantifiable economic loss consequential to the coercion.

**Injury J — Public Adjuster Fees.** The fees paid to David Calliham of AMF Claims Consultants, retained because Travelers' systemic claims-handling failures made direct negotiation impossible. This is a quantifiable consequential economic loss.

**Injury K — Mold Inspection Cost.** The fee paid to Choice Consulting for the mold inspection obtained in reliance on Travelers' fraudulent recommendation. This is a fraud-exclusive direct reliance cost.

**Injury L — Opportunity Cost of the Mold-Report Path.** The additional time, expense, and property deterioration attributable to following the mold-report path rather than the PuroClean-continuation path that would have been followed absent Travelers' fraudulent recommendation. This is a fraud-exclusive reliance-based economic loss measured by the difference between the

expected outcome under the PuroClean-continuation path and the actual outcome under the mold-report path.

**Injury M — Betrayal Distress.** The specific emotional harm of discovering that Travelers' mold-report recommendation was designed to create a coverage trap—the distress of having trusted a fiduciary and learning that the trust was exploited. This is a fraud-exclusive emotional injury; its independence under *Stoker*/*Menchaca* is partial (the deception is independently tortious, but the magnitude of the distress depends partly on the financial consequences).

**Injury N — Generalized Anxiety (Not Independently Claimed).** The generalized anxiety, sleeplessness, and emotional turmoil from the overall claims process. This category is NOT asserted as a standalone independently compensable injury because it is predominantly caused by nonpayment-dependent stressors and is unlikely to satisfy the *Stoker*/*Menchaca* independence requirement. It is alleged solely as causal context for Injury E—establishing the baseline stress environment that contributed to the biochemical depletion triggering the paralysis episodes.

**Injury O — ALE Displacement Distress (Not Independently Claimed).** The stress from repeated housing disruptions caused by Travelers' underauthorization of ALE. This category is NOT asserted as a standalone independently compensable emotional-distress injury because it is directly caused by the nonpayment of a Policy benefit and would be cured by adequate ALE payment. The economic component (unreimbursed lease costs, moving expenses) is subsumed within Injury A.

**Injury P — Coercion Submission Distress.** The psychological harm of having been coerced into compliance with extortionate demands—humiliation from forced degrading labor, helplessness from the absence of choice, anticipatory dread during the compliance period, and post-compliance recognition of having been exploited. This injury's independence under *Stoker*/*Menchaca* is contested: the coercion mechanism (extortion) is independently tortious, but the content of the coercion (ALE, a policy benefit) implicates the coverage dispute. Plaintiffs assert this injury as independently caused by the act of coercion (violation of personal autonomy) rather than by the subject of coercion (coverage adequacy).

**Injury Q — Loss of Business Opportunities (Both Smiths).** Business income and business opportunities lost during Periods 2 and 3 (October 21, 2024 through approximately August 2026) because the racketeering pattern diverted the Smiths' time, labor, financial resources, and professional capacity away from their independent business pursuits. This injury is asserted only in the RICO counts. To the extent Injury Q includes Mr. Smith's caregiving-related lost business income or Mrs. Smith's lost earning capacity, those components are pled under the state-law counts as Injuries S and T and are included in Injury Q in the alternative, subject to the one-satisfaction rule. Business losses during Period 1 (the date of loss through October 20, 2024) predate the extortion predicates and are not claimed as part of Injury Q. Specifically:

**(a) Mr. Smith's technology ventures.** Curtailed during Periods 2 and 3 through the four concurrent mechanisms described in the Statement of Facts, including lost first-mover advantage, expired licensing and funding windows, and the time-value of delayed commercial activity.

**(b) Mrs. Smith's art** and greeting-card business. Curtailed during Periods 2 and 3 by the physical incapacity caused by her paralysis episodes and their continuing consequences, including the loss of her 2025 August–September selling season, as described in the Statement of Facts. This component is pled in the alternative to Injury T.

Injury Q will be quantified through business records, patent and licensing documentation, and expert analysis, under protective order if commercially necessary, in amounts to be determined at trial.

**Injury R — Increased Medical Expenses.** The ongoing medical costs for treatment of Mrs. Smith's paralysis episodes and their consequences (hypoxia-related brain injury evaluation, neurological monitoring, continuing symptom management). This is a quantifiable economic loss consequential to Injury E.

**Injury S — Mr. Smith's Caregiving-Related Lost Business Income.** Business income Mr. Smith lost from April 2025 through approximately August 2026 (Period 3) because the continuing consequences of Mrs. Smith's paralysis episodes (Injury E) required him to serve as her full-time caregiver, displacing substantially all of his business activity. Injury S is distinct from Injury G,

which is limited to income lost from coerced remediation labor from approximately October 24, 2024 through January 2025, and Injury S does not include any period for which Injury G is claimed. This is an independent injury: it flows from Mrs. Smith's bodily injury caused by threats of violence, not from the denial of policy benefits, and would persist even if all Policy benefits were paid in full.

**Injury T — Mrs. Smith's Lost Earning Capacity.** The loss of Mrs. Smith's capacity to earn income from her art and greeting-card business during Periods 2 and 3, including the loss of her 2025 August–September selling season and continuing reduced capacity into 2026, resulting from her paralysis episodes and their continuing consequences (Injury E). Loss of earning capacity is an element of damages for bodily injury. This is an independent injury: it flows from bodily injury caused by threats of violence, not from the denial of policy benefits, and would persist even if all Policy benefits were paid in full.

163. The Smiths have incurred injuries independent of and unassociated with the denial of policy benefits. These independent injuries, organized by the conduct that caused them, include: **Injuries from Category A Conduct (Independent Property Damage):** Injury C — Additional property deterioration (inspection delay), Injury D — Additional property deterioration (PuroClean scope constraints), Injury B — Additional property deterioration (mold-report halt); **Injuries from Category B Conduct (Threats and Coercion):** Injury E — Mrs. Smith's paralysis episodes and medical consequences, Injury F — Fear for physical safety (both Smiths), Injury G — Mr. Smith's lost business income, Injury H — Below-market property sale, Injury I — Out-of-pocket remediation costs, Injury P — Coercion submission distress, Injury R — Increased medical expenses, Injury S — Mr. Smith's caregiving-related lost business income, Injury T — Mrs. Smith's lost earning capacity; **Injuries from Category C Conduct (Fraudulent Inducement):** Injury K — Mold inspection cost, Injury L — Opportunity cost of the mold-report path, Injury M — Betrayal distress.

164. Injuries not independently claimed include: Injury N — Generalized anxiety (alleged as causal context for Injury E only), Injury O — ALE displacement distress (economic component subsumed in Injury A).

165. In addition, Travelers' conduct was outrageous and extreme in light of the threats, intimidation, and attempted coercion of the Smiths into accepting unreasonable settlement terms to the Smiths' detriment and to the financial benefit of Travelers. This conduct constitutes bad faith and grossly malicious conduct that has resulted in the independent injuries defined above.

## IV. RICO CASE STATEMENT

166. Travelers operates as an enterprise affecting interstate commerce, and the Smiths suffered injury to property through the coerced settlement attempts by Ramseier. The recorded threats of physical and financial harm against the Smiths to coerce acceptance of an inadequate settlement constitute extortion—obtaining property — Plaintiffs' claim rights and concessions, the value of Mr. Smith's coerced labor and services, and the economic value of benefit payments retained or reduced, as described in the Hobbs Act allegations below — "with [their] consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2).

167. For clarity and specificity, these claims involve the Racketeer Influenced and Corrupt Organizations Act ("RICO"), codified in 18 U.S.C. §§ 1961–1968. Plaintiffs submit the following RICO Case Statements.

***RICO Case Statement 1: Whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c), and/or (d).***

168. Plaintiffs assert RICO claims under 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

***RICO Case Statement 2: Defendants and Basis of Liability***

169. Defendant Benjamin Ramseier:

- Count 10 — 18 U.S.C. § 1962(c): Ramseier, employed by Travelers Indemnity and assigned to adjust claims for the enterprise Travelers Personal, conducted Travelers Personal's affairs through a pattern of "racketeering activity" as defined in 18 U.S.C. § 1961 et seq.

Specifically, Ramseier conducted Travelers Personal's affairs through a pattern of violations of 18 U.S.C. § 1951 (extortion) and 18 U.S.C. § 1343 (wire fraud). Ramseier is distinct from the enterprise within the meaning of § 1962(c) both as a natural person distinct from a corporate entity, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001), and as an employee of a different corporate entity (Travelers Indemnity) from the enterprise (Travelers Personal).

- Count 11 — 18 U.S.C. § 1962(d): Ramseier conspired with Travelers Personal and Travelers Indemnity to violate 18 U.S.C. § 1962(c) through a pattern of violations of 18 U.S.C. § 1951 and 18 U.S.C. § 1343.

170. Defendant Travelers Indemnity:

- Count 10 — 18 U.S.C. § 1962(c): Travelers Indemnity conducted the affairs of the enterprise Travelers Personal through a pattern of racketeering activity by: (a) employing and deploying Ramseier to adjust Travelers Personal's claims, including Claim I8C4809; (b) owning and operating the travelers.com email domain and associated email servers through which the wire fraud predicate acts (#4–#7) were transmitted across state lines from servers in Washington, Virginia, and Iowa; (c) maintaining Ramseier in his position and on this Claim without discipline after the October 21, 2024 threats; and (d) ratifying the fraudulent microbial classification through Ramseier's continued transmission of estimates containing it. Travelers Indemnity is a separate corporate entity from Travelers Personal — an affiliated company under common ownership through TIGHI, with its own NAIC number (25658), its own EIN (06-0566050), and its own Connecticut charter — and is therefore formally distinct from the enterprise for § 1962(c) purposes.

- Count 11 — 18 U.S.C. § 1962(d): Travelers Indemnity conspired with Ramseier and Travelers Personal to violate 18 U.S.C. § 1962(c) through a pattern of violations of 18 U.S.C. § 1951 and 18 U.S.C. § 1343.

171. Defendant Travelers Personal:

- Count 11 — 18 U.S.C. § 1962(d): Travelers Personal conspired with Ramseier and Travelers Indemnity to violate 18 U.S.C. § 1962(c). As the enterprise whose affairs were

conducted through racketeering, Travelers Personal is not itself a § 1962(c) "person" but is a co-conspirator under § 1962(d) because it agreed to the conduct: Travelers Personal assigned Ramseier to the Claim, accepted and adopted his estimates as its coverage positions, reviewed and reaffirmed the microbial classification at levels above Ramseier, and took no action to disavow or correct Ramseier's conduct despite audio-recorded evidence of threats.

***RICO Case Statement 3: List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.***

*172.* None known at this time outside of those presented in the predicates.

***RICO Case Statement 4: Injuries to Plaintiffs***

173. The Smiths were the targeted victims of this pattern of racketeering through extortion and/or attempted extortion and fraud that is the direct and proximate cause of financial, property, and personal loss including: (a) loss from personal responsibility and partial financial responsibility for demolition and remediation; (b) loss from accepting personal and financial responsibility for demolition, remediation, restoration, and reconstruction of water-damaged items in the mold remediation protocol; (c) loss from an improper and inadequate financial settlement; (d) loss of income; (e) loss of business opportunities including Mr. Smith's curtailed technology development, patent licensing, and software ventures and Mrs. Smith's curtailed art and greeting-card business, each diverted by the racketeering pattern's direct labor demands, caregiving obligations, financial resource diversion, and time consumption; (f) loss of health; (g) loss on the sale of a property; and (h) loss from severe emotional distress.

174. Predicate Acts #1 and #3 (extortion on October 21, 2024) proximately caused Injuries G, H, and I by coercing Plaintiffs to divert work hours to demolition, incur out-of-pocket remediation costs, and sell assets at a discount to fund housing after the ALE ultimatum. Predicate Act #2 (prior rooftop death-threat confession) amplified Plaintiffs' fear of imminent bodily injury (Injury F), contributing to the physiological cascade that produced Mrs. Smith's near-fatal paralysis episodes (Injury E). Predicate Acts #4–#7 (wire-fraud transmissions) furthered the scheme by embedding and ratifying the knowing misclassification that suppressed Claim value and reinforced the

extortion, thereby proximately causing continued out-of-pocket remediation expenses (Injury I) and lost income (Injury G).

***RICO Case Statement 5: Pattern of Racketeering Activity***

175. The following Predicate Acts constitute a pattern of racketeering activity that is the proximate cause of property loss, financial loss, other economic loss, and severe emotional distress for the Smiths. A RICO pattern requires two or more related predicate acts posing a threat of continued criminal activity.

176. **Relatedness.** All predicate acts are related because they share: (a) a common purpose — reducing Travelers' claim expenditures by extracting concessions from insureds rather than paying covered losses; (b) a common method — exploiting insureds' dependence on Loss of Use benefits as a pressure point to coerce acceptance of inadequate settlement terms, and transmitting knowingly false coverage classifications to suppress claim value; (c) a common enterprise — Travelers; (d) a common victim class — first-party residential or other property-damage insureds with active coverage disputes; and (e) a common enterprise function — claims adjustment operations. The wire fraud predicates (#4–#7) furthered and reinforced the extortion predicates (#1, #3) by creating financial pressure that made the ALE conditioning effective. Each successive estimate transmission reaffirmed the enterprise's position on the classification and the concessions Ramseier extracted. The additional predicates illustrate the independent replication of the identical ALE-conditioning method by four different enterprise employees and/or agents on four separate claims in three different states shows that the conduct was not isolated to one adjuster.

177. **Closed-ended continuity (primary theory).** The predicate acts extend over a closed period of approximately seven to eight years — from at least 2018 (Predicate Act #10, Randel) through December 12, 2025 (Predicate Act #9, Shearman). This period involves ten predicate acts committed by four different enterprise employees and/or agents against four separate insured households. The effects of the closed-period conduct continue: the microbial classification transmitted on February 21, 2025, has never been withdrawn; on information and belief Ramseier remains employed by Travelers with the same claims-adjustment authority; the Smiths continue

to suffer the injuries proximately caused by the predicate acts; and as of the filing of this Complaint, Travelers has maintained its coverage position for over eighteen months without correction.

178. **Open-ended continuity (alternative theory).** Plaintiffs allege that the predicate conduct projects into the future with a threat of repetition because: (a) four independent adjusters deployed the identical ALE-conditioning method on four separate claims over a period of years as part of Travelers' ongoing claims operations, including claims issued by multiple Travelers policy-issuing entities—Travelers Personal and Travelers Lloyds—demonstrating that the method is embedded in Travelers' institutional infrastructure rather than confined to a single subsidiary; (b) Travelers' claims operations continuously generate new first-party property-damage claims that could involve the same ALE-conditioning and misclassification conduct; (c) Predicate Act #9 (Shearman, December 12, 2025) occurred after this lawsuit was filed in August 2025; (d) the fraudulent microbial classification has stood uncorrected for over eighteen months despite formal dispute, consultant review contradicting it, and pending litigation, demonstrating institutional commitment to the scheme rather than self-correction; and (e) on information and belief, Ramseier continues in Travelers' employment with the same authority to adjust claims, and Travelers has taken no action to disavow Ramseier's threats, to reassign the Claim, or to discipline him. The predicates and misclassification-by-estimate communications were not a one-off reaction to Plaintiffs' Claim but part of the enterprise's regular way of conducting claim settlements. Absent suit, there was no internal stopping point; the pattern projected into the future with a threat of repetition, consistent with an open-ended continuity theory.

179. The McCarran-Ferguson Act does not bar these RICO claims. RICO's application here complements rather than invalidates, impairs, or supersedes Texas insurance regulation. Texas independently prohibits the same conduct alleged — misrepresentation, unfair settlement practices, and unconscionable acts — through Tex. Ins. Code §§ 541.051, 541.060, 541.061, 542.003, and provides cumulative private remedies. Separately, the predicate acts — physical threats, extortion through fear of homelessness, and knowing falsification of claim classifications

— are not the "business of insurance" because they do not transfer or spread policyholder risk, are not legitimate incidents of the policy relationship, and are not conduct unique to insurance entities. The McCarran-Ferguson Act does not transform threats, extortion, and knowingly false claim classifications into protected insurance conduct.

180. On information and belief, the conduct described herein is applied by Travelers to other first-party claims and is not confined to Plaintiffs' claim. Plaintiffs will identify other claims to which the practice was applied through investigation and the discovery. Plaintiffs may seek leave to amend this Complaint to augment the pattern of racketeering activities and associated claims.

**Hobbs Act Violations — 18 U.S.C. § 1951.**

181. The Hobbs Act, codified at 18 U.S.C. § 1951 and included as RICO predicates under 18 U.S.C. § 1961(1)(B), makes it a federal crime to obstruct, delay, or affect commerce "by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. § 1951(a). The statute defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

182. As applied to the instant case, Hobbs Act violations may contain two distinct types of threats, each with a different wrongfulness standard: threats of violence and threats of economic harm.

**Hobbs Act Violations – Violence**

183. Where extortion rests on threats of physical violence, the wrongfulness inquiry is straightforward. A threat of bodily harm is wrongful in itself, and the claim-of-right defense is unavailable. The extortionist's belief that he is entitled to the property he demands is no defense. Ramseier's threats of physical violence require no claim-of-right analysis; threatening an insured with bodily harm to obtain acquiescence is wrongful within the meaning of § 1951(b)(2).

**Hobbs Act Violations – Economic Harm**

184. The Hobbs Act extends to threats of economic harm. The governing distinction is between the legitimate use of economic fear (hard bargaining) and its wrongful use (extortion).

185. The use of fear of economic loss is "wrongful" under the Hobbs Act a) when it is employed to achieve a wrongful purpose, i.e. to obtain property to which the defendant has no lawful claim or b) when the defendant has no claim of right to that property. Stated another way, if a victim has a pre-existing right to be free from the threatened harm, typically arising from contract or statute, exploitation of economic fear to override that right constitutes extortion.

186. Extortion under the Hobbs Act requires obtaining (deprivation and acquisition) of property. The property must be transferable, i.e., capable of passing from one person to another. Labor and services may also constitute Hobbs Act property.

187. Plaintiffs identify three forms of property: (a) Plaintiffs' claim rights and concessions to already-purchased accrued policy benefits, including their rights to demand continued Coverage D benefits, pursue Coverage A water-damage and Ordinance or Law benefits, dispute Travelers' reduced scope and microbial classification, and withhold any release, compromise, acquiescence, or controlled exercise of those rights; (b) the value of Mr. Smith's demolition and remediation labor and services; and (c) the economic value of benefit payments retained, reduced, or extinguished through the coerced surrender or controlled exercise of those rights.

188. The obtaining-property requirement is satisfied, or at minimum plausibly alleged as attempted extortion, because Travelers sought to obtain and control Plaintiffs' transferable contractual claim rights and related concessions, the value of Mr. Smith's coerced remediation labor and services, and the economic value of reduced or retained benefit payments resulting from those coerced concessions.

189. The claim-rights and concessions theory is the primary obtaining theory. The Smiths had a contractual right to Loss of Use benefits when a covered loss rendered the residence premises "not fit to live in," for the shortest time to "repair or replace the damage," "settle your household elsewhere, if you permanently relocate," or "24 months." Those policy-benefit rights are

contractual money-benefit rights capable of release, assignment, compromise, settlement, enforcement, and suit. Travelers used the fear of losing acknowledged ALE housing benefits to force Plaintiffs to restart demolition on Travelers' demanded timeline, assume unapproved remediation expenses, personally perform work Travelers refused to fund, and acquiesce to Travelers' reduced scope, valuation, and microbial classification.

190. The property also included the value of Mr. Smith's coerced demolition and remediation labor and services. Ramseier's ultimatum conditioned continued ALE consideration on Plaintiffs restarting demolition within one or two weeks and personally assuming remediation responsibilities that Travelers had refused to fund. Mr. Smith responded by taking time from work, purchasing equipment and materials, constructing containment, operating negative HEPA air movers, and performing demolition and remediation tasks that professional contractors otherwise would have performed. The value of that labor and service benefited Travelers by shifting remediation work, timing pressure, and cost responsibility from Travelers to Plaintiffs.

191. Travelers' retention or reduction of benefit payments provides an additional and alternative obtaining theory and supplies evidence of motive, value, and acquisition. Plaintiffs allege that Travelers obtained, or attempted to obtain, Plaintiffs' transferable claim rights, release or acquiescence, personal remediation labor, and assumption of remediation costs. The retained or reduced benefits are the economic value Travelers captured by coercing Plaintiffs to part with or exercise those rights in Travelers' favor. Benefits owed under a first-party property policy are money capable of passing from insurer to insured, and the insured's claim to those benefits can be assigned, released, settled, compromised, or sued upon.

192. Loss of Use coverage is a fixed contractual entitlement that attaches when a covered loss renders the residence premises not fit to live in, and its payment is not a term under negotiation. The Smiths' Policy fixed the obligation to pay covered benefits before the dispute arose.

193. Plaintiffs allege a pattern of Hobbs Act extortion and/or attempted extortion arising from threats of economic harm. The pattern includes: (a) Travelers' initial authorization of Loss of Use coverage for additional living expenses; and (b) the subsequent suspension, threat of suspension,

cancellation, or threat of cancellation of Loss of Use benefits before the insured property was restored to a condition that is “fit to live in.” Plaintiffs allege that Travelers used this conduct to coerce insureds to accept claim settlements at a fraction of actual restoration cost, assume direct or indirect financial responsibility or other burdens related to the loss or ongoing living expenses, and act on a timeline advantageous to Travelers and detrimental to the insured.

194. In general terms, the following can be applied to any similar situation. From the perspective of the insured, living expenses and housing accommodations are necessary and immediate needs. The attempted or actual denial or delay of Loss of Use benefits (also known as ALE) is commonly used by the insurer as a pressure point on the insured. A denial of Loss of Use benefits creates an immediate crisis for the insured, placing an insurance company in a superior position and relegating insureds to a subordinate position. In such circumstances, disputes over dwelling and property damages exist and by definition the parties cannot agree whether the outcome of “repair or replace the damage” has been achieved. Since the insurance company previously determined that the covered claim made “the residence premises where you reside not fit to live in”, the premises may not be returned to a state of “fit to live in” until both parties agree on damages and effect the repairs. When an insurance company unilaterally determines that a residence is “fit to live in”, the insurance company is declaring its dwelling and/or personal property estimates and timelines to be correct and adequate, without regard to the judgment of the insured.

195. Plaintiffs allege that this conduct constitutes extortion, not hard bargaining.

**Predicate Act #1: Extortion on October 21, 2024 — violation of 18 U.S.C. § 1951.**

196. Ramseier directly threatened Plaintiff with serious bodily injury and indirectly threatened Plaintiff with death to prevent Plaintiff from disputing Claim coverage for flooring in an upstairs bedroom. On October 21, 2024, during a property inspection at the Smiths' residence, Ramseier directly threatened Plaintiff with serious bodily injury — offering a "free hospital ride" and invoking his willingness to use his fists. Ramseier illustrated and escalated the threat by recounting, in the first person, a prior incident in which he threatened to throw a public adjuster off a rooftop and kill him, emphasizing that the recipient of that threat "knew I wasn't kidding

about it". Commenting on his ability to dominate a confrontation, Ramseier stated that some people are “ready to put their hands on you … which is hilarious to me, because I spent ten years putting my hands on people. So when they figure that part out, they decide it is bad.”

197. Ramseier's threats placed Plaintiff in a state of fear of imminent serious bodily injury or death, fear of financial failure including the loss of the home, and fear of the loss of a place to live and provide healthcare for Mrs. Smith. Subsequently, Mr. Smith related these threats to Mrs. Smith. As a consequence, Mrs. Smith immediately experienced severe emotional distress that began to deplete critical biochemicals and led to near-death paralysis.

198. The property obtained through these threats was the Smiths' acquiescence to Travelers' reduced scope and valuation of loss — a relinquishment of valuable claim rights.

199. The claim-of-right defense is unavailable where the means employed are physical violence or threats thereof. The violent threats were instrumentally connected to the conditioning of ALE benefits, in which Ramseier demanded that the Smiths personally assume remediation responsibility within one to two weeks or face discontinuation of housing coverage. The audio recording of the October 21, 2024 encounter, lawfully made under Texas's one-party consent statute, Tex. Penal Code § 16.02(c)(4), provides direct, contemporaneous evidence of the threats.

**Predicate Act #2: Extortion within approximately three years prior to October 21, 2024 — violation of 18 U.S.C. § 1951**.

200. Ramseier threatened a third-party public adjuster with death over a dispute in claim coverage. On October 21, 2024, Ramseier confessed that he had threatened to kill a public adjuster by throwing him from a rooftop during a property inspection. Ramseier recounted his comment saying, “Like dude, this is going to be a bad decision, but if you are going to fight me, I am going to throw you off this roof and kill you right now.” The incident concerned a property damage claim in Chicago, Illinois over which the insured's public adjuster disagreed with Ramseier regarding the extent and/or value of claimed property damage. Ramseier emphasized that the recipient of that threat "knew I wasn't kidding about it". Commenting on his ability to dominate a confrontation, Ramseier stated that some people are “ready to put their hands on you … which is hilarious to me,

because I spent ten years putting my hands on people. So when they figure that part out, they decide it is bad."

201. The claim-of-right defense is unavailable where the means employed are physical violence or threats thereof. The audio recording of the October 21, 2024 confession, lawfully made under Texas's one-party consent statute, Tex. Penal Code § 16.02(c)(4), provides direct evidence.

202. Upon information and belief, the property obtained through these threats was acquiescence to Travelers' reduced scope and valuation of loss — a relinquishment of valuable claim rights. The exact timing, location, detail, property, and parties are expected to be revealed during discovery. This incident occurred during the approximately three years Ramseier had been employed by Travelers and as such serves as an additional indication of relationship (including this past event used as a tool in the current events) and continuity.

**Predicate Act #3: Extortion on October 21, 2024 — violation of 18 U.S.C. § 1951.**

203. Ramseier threatened that Plaintiffs' additional living expense coverage would likely be denied unless Plaintiffs immediately assumed responsibility and at least partial financial liability for remediation and rebuilding of the damaged house. Ramseier communicated that any additional ALE authorizations would be "hard to grant" unless the Smiths re-started demolition within one or two weeks, requiring the Smiths to bear unapproved expenses associated with (a) authorized demolition and remediation and (b) demolition, remediation, and reconstruction required by the mold report. Travelers thereby placed Plaintiffs in fear of financial failure, loss of income, depletion of available funds, loss of housing, and loss of the ability to provide stable care for Mrs. Smith. This conduct caused Plaintiffs to relinquish work time, forgo business opportunities, assume at least partial responsibility for Claim damages, personally perform remediation, incur out-of-pocket remediation costs, and accept a below-market offer on property listed for sale.

204. The property Travelers sought to obtain was Plaintiffs' compelled exercise of their claim rights in Travelers' favor: restarting demolition on Travelers' demanded timeline, performing remediation themselves, advancing personal funds for work Travelers refused to fund, assuming the risk of unapproved remediation and reconstruction costs, and foregoing the immediate exercise

of claim rights that would have required Travelers to fund professional remediation and continued ALE without those concessions. These concessions had objective economic value to Travelers because they reduced or delayed Travelers' claim payments, shifted work and expense to Plaintiffs, and maintained Travelers' reduced scope and microbial classification.

205. The surrounding facts show why the economic threat was wrongful rather than hard bargaining. Travelers had already acknowledged and accepted as payable Loss of Use coverage, initially authorizing ALE through the end of February 2025. Travelers knew the mold-report findings consisted entirely of mold due to water damage. Travelers knew the remediation specified in the mold report was required before general demolition and remediation could continue. Travelers misclassified water-related remediation and restoration contained in the mold report as mold damage, denying coverage for that water-related damage under both Coverage A (Dwelling) and Additional Coverage 12 (Ordinance or Law). Travelers then conditioned further Coverage D (Loss of Use) benefits on immediate resumption of demolition and remediation. The result was that the Smiths were forced to assume execution and financial responsibility for remediation and restoration amounting to approximately $50,000 to $70,000 or risk forfeiting Loss of Use coverage and having no place to live. Mr. Smith acquiesced to Travelers' conditions, starting demolition and remediation three days later on October 24, 2024. Later ALE extensions were only granted after the Smiths complied (see Travelers Answer, September 23, 2025, ¶51). Ramseier stated that Travelers exercises approval of adjustment decisions and that the ALE conditioning and related claims strategy would be subject to institutional review: "So it will end up getting reviewed, probably general counsel and all those other people that involved on big decisions, big money decisions" and "I know a hundred percent it's going to get pushed up for review given the situation and the optics of it, so I may get overturned somewhere along the ladder." These admissions show that the ALE conditioning and claims strategy were subject to institutional direction and review, not merely Ramseier's individual decision.

206. The Smiths had a Coverage D contractual right to Loss of Use benefits while the residence remained not fit to live in. Travelers conditioned acknowledged ALE benefits on Plaintiffs'

capitulation to an inadequate settlement position, personal responsibility for remediation, assumption of remediation costs, and delayed or impaired exercise of their claim rights. One offense pleaded is the attempt. The property obtained or sought included at least: (a) Plaintiffs' controlled exercise, compromise, release, or acquiescence in their claims for Coverage D (Loss of Use), Coverage A (Dwelling), water-damage benefits misclassified as "Fungi" or Other Microbes Remediation, and Ordinance or Law coverage; (b) the value of Mr. Smith's coerced demolition and remediation labor and services; (c) Plaintiffs' assumption of out-of-pocket remediation expenses; and (d) the economic value to Travelers of reducing, delaying, or extinguishing liability for one or more claims. Travelers confirmed the extortion by accepting the concessions Ramseier extracted: later ALE extensions were granted only after the Smiths complied with the extortionate demands (see Travelers Answer, September 23, 2025, ¶51). That post-extortion ratification shows that the ALE conditioning was enterprise policy, not Ramseier's solo improvisation. The same institutional agreement is evidenced by parallel conduct: other Travelers adjusters independently deployed the identical ALE-conditioning method—Matthew Law on the Bester-Nunn claim, David Garza on the Shearman claim, and Mike Boone on the Randel claim—on separate claims.

207. Plaintiffs allege that this conduct constitutes Hobbs Act extortion and/or attempted extortion. If the Court concludes that any particular item of property was not actually obtained, Plaintiffs plead in the alternative attempted extortion.

208. The audio recording of the October 21, 2024 encounter, lawfully made under Texas's one-party consent statute, Tex. Penal Code § 16.02(c)(4), provides direct, contemporaneous evidence of the threats of economic harm.

**Predicate Act #4: Wire fraud on or about September 3, 2024 — violation of 18 U.S.C. § 1343**.

209. Travelers and Ramseier sent a communication transmitted via email as sender BRAMSEIE@travelers.com from a sending server with a Washington, USA IP address to David Smith with the email address david.smith@pdfcomplete.com on a server located in Bryan, Texas that contained an attached claim estimate dated September 2, 2024. The estimate represented, as a matter of fact, that "microbial-only" damage existed at the Property separate from the water

damage, and classified water-related damage remediation and reconstruction accordingly. That factual representation was false: the mold inspection report found no mold damage in any location not damaged by water and attributed all identified mold to the water loss. The misrepresentation was material because it moved water-damage remediation and reconstruction otherwise payable under dwelling coverage beneath the $5,000 Limited "Fungi" or Other Microbes Remediation sublimit. Travelers knew the representation was false when made: (a) between July 24 and July 26, 2024, Ramseier told Mr. Smith by telephone that any mold caused by the water damage was a "moot point" because it would be covered by dwelling benefits; (b) this same September 2, 2024 estimate classified the water as ANSI/IICRC Category 3; and (c) the mold inspection report, which attributed all identified mold to the water loss, was in Travelers' possession before the estimate issued. This estimate confirms that Ramseier's statements are the agreed written position of Travelers. The object of the scheme was to obtain money or property: Travelers' avoidance of payment for the water-damage remediation and reconstruction assigned to the sublimit, and Plaintiffs' assumption of that cost. The travelers.com domain through which this communication was transmitted is operated by Travelers Indemnity. The email was routed through Travelers Indemnity's mail servers, sent from a Travelers Indemnity employee's account, and delivered to Plaintiffs bearing the Travelers Indemnity domain name.

**Predicate Act #5: Wire fraud on or about October 3, 2024 — violation of 18 U.S.C. § 1343**.

210. Travelers and Ramseier sent a communication transmitted via email as sender BRAMSEIE@travelers.com from a sending server with a Virginia, USA IP address to David Smith with the email address david.smith@pdfcomplete.com on a server located in Bryan, Texas copying AMF Claims Consultants at email address claims@amfclaims.com that contained an attached claim estimate dated October 1, 2024. The estimate represented, as a matter of fact, that "microbial-only" damage existed at the Property separate from the water damage, and classified water-related damage remediation and reconstruction accordingly. That factual representation was false: the mold inspection report found no mold damage in any location not damaged by water and attributed all identified mold to the water loss. The misrepresentation was material because it

moved water-damage remediation and reconstruction otherwise payable under dwelling coverage beneath the $5,000 Limited "Fungi" or Other Microbes Remediation sublimit. Travelers knew the representation was false when made: (a) between July 24 and July 26, 2024, Ramseier told Mr. Smith by telephone that any mold caused by the water damage was a "moot point" because it would be covered by dwelling benefits; (b) Travelers' own September 2, 2024 estimate had already classified the water as ANSI/IICRC Category 3; and (c) the mold inspection report, which attributed all identified mold to the water loss, had been in Travelers' possession for approximately two months. This estimate confirms that Ramseier's statements are the agreed written position of Travelers. The object of the scheme was to obtain money or property: Travelers' avoidance of payment for the water-damage remediation and reconstruction assigned to the sublimit, and Plaintiffs' assumption of that cost. The travelers.com domain through which this communication was transmitted is operated by Travelers Indemnity. The email was routed through Travelers Indemnity's mail servers, sent from a Travelers Indemnity employee's account, and delivered to Plaintiffs bearing the Travelers Indemnity domain name.

**Predicate Act #6: Wire fraud on or about November 4, 2024 — violation of 18 U.S.C. § 1343**.

211. Travelers and Ramseier sent a communication transmitted via email as sender BRAMSEIE@travelers.com from a sending server with an Iowa, USA IP address to David Smith with the email address david.smith@pdfcomplete.com on a server located in Bryan, Texas copying AMF Claims Consultants at email address claims@amfclaims.com and david@amfclaims.com that contained an attached claim estimate dated November 1, 2024. The estimate represented, as a matter of fact, that "microbial-only" damage existed at the Property separate from the water damage, and classified water-related damage remediation and reconstruction accordingly. That factual representation was false: the mold inspection report found no mold damage in any location not damaged by water and attributed all identified mold to the water loss. The misrepresentation was material because it moved water-damage remediation and reconstruction otherwise payable under dwelling coverage beneath the $5,000 Limited "Fungi" or Other Microbes Remediation sublimit. The estimate furthered the conduct described in Predicate Act #3 by confirming

Ramseier's statements as the written position of Travelers. Travelers knew the representation was false when made: in addition to the facts alleged in Predicate Acts #4 and #5, during the October 21, 2024 inspection Ramseier acknowledged that the water damage was classified as Category 3 water, and stated that Travelers exercises approval of adjustment decisions. With regard to the microbial classifications and an additional mold report, Ramseier stated "So it will end up getting reviewed, probably general counsel and all those other people that involved on big decisions, big money decisions" and "I know a hundred percent it's going to get pushed up for review given the situation and the optics of it, so I may get overturned somewhere along the ladder." Ramseier further stated that "some person seven levels above me is going to make a business decision about risk of the company," confirming that the classification was maintained as a business-risk decision rather than a good-faith assessment of the cause of the damage. This Predicate Act was transmitted after the October 21, 2024 inspection at which the classification was expressly disputed. Travelers reviewed the dispute and reaffirmed the classification rather than correcting it. The object of the scheme was to obtain money or property: Travelers' avoidance of payment for the water-damage remediation and reconstruction assigned to the sublimit, and Plaintiffs' assumption of that cost. The travelers.com domain through which this communication was transmitted is operated by Travelers Indemnity. The email was routed through Travelers Indemnity's mail servers, sent from a Travelers Indemnity employee's account, and delivered to Plaintiffs bearing the Travelers Indemnity domain name.

**Predicate Act #7: Wire fraud on or about February 21, 2025 — violation of 18 U.S.C. § 1343**.

212. Travelers and Ramseier sent a communication transmitted via email as sender BRAMSEIE@travelers.com from a sending server with a Virginia, USA IP address to David Smith with the email address david.smith@pdfcomplete.com on a server located in Bryan, Texas copying AMF Claims Consultants at email address claims@amfclaims.com and david@amfclaims.com that contained an attached claim estimate dated February 21, 2025. The estimate represented, as a matter of fact, that "microbial-only" damage existed at the Property separate from the water damage, and classified water-related damage remediation and

reconstruction accordingly. That factual representation was false: the mold inspection report found no mold damage in any location not damaged by water and attributed all identified mold to the water loss. The misrepresentation was material because it moved water-damage remediation and reconstruction otherwise payable under dwelling coverage beneath the $5,000 Limited "Fungi" or Other Microbes Remediation sublimit. Travelers knew the representation was false when made, for the reasons alleged in Predicate Acts #4 through #6 and for the following additional reasons. The estimate was issued after Travelers engaged a consultant (South Texas Restoration) to review the disputed items and increased the microbial misclassification from $29,408.97 to $32,268.37 even though the consultant's review contradicted Traveler's microbial classification. The incremental increase demonstrates active recalculation that necessarily re-encountered and re-affirmed the misclassification. In the February 21, 2025, email that included this estimate, Ramseier stated, "The South Texas Restoration estimate did not separate the water damage rebuild from the microbial-only damage build. As discussed previously the rebuild for the microbial-only damage falls within the Limited "Fungi" or Other Microbes Remediation additional coverage." That statement asserted the existence of "microbial-only damage" as a fact, when no such damage had been found. The object of the scheme was to obtain money or property: Travelers' avoidance of payment for at least $32,268.37 in water-damage remediation and reconstruction assigned to the sublimit, and Plaintiffs' assumption of that cost. This estimate was Travelers' last substantive communication regarding the Claim and has stood uncorrected for over eighteen months. The travelers.com domain through which this communication was transmitted is operated by Travelers Indemnity. The email was routed through Travelers Indemnity's mail servers, sent from a Travelers Indemnity employee's account, and delivered to Plaintiffs bearing the Travelers Indemnity domain name.

213. The following Predicate Acts describe conduct committed by other parties who are not named defendants but who operate within the same enterprise (Travelers). These Predicate Acts are pled for two purposes: (1) to establish the existence and structure of the enterprise, its pattern

of racketeering activity, and the continuity of its racketeering pattern, and (2) as additional basis for § 1962(d).

**Predicate Act #8: Extortion of a similar third-party insured on or about February 23, 2023 — violation of 18 U.S.C. § 1951**.

214. Upon information and belief, on or about February 23, 2023, Travelers' representative Matthew Law extorted and/or attempted to extort insureds Carrie Bester-Nunn and Kenneth Nunn. The RICO enterprise is Travelers and Travelers claims representative Matthew Law conducted the affairs of the enterprise with regard to claim adjustment. Bester-Nunn v. Travelers Personal Insurance Co., No. 3:24-cv-00227 (N.D. Tex. Jan. 29, 2024) alleges the following:

a. On December 27, 2022, Bester-Nunn's property sustained massive water damage during the policy period. The damage was widespread throughout the entire home, including the dwelling and its contents. The Bester-Nunns are elderly and include an immunocompromised family member.

b. The Bester-Nunns allege that Travelers' claims representative, Matthew Law, assessed the replacement cost value of the damage to be $14,384.12, providing payment of $11,677.31. The Bester-Nunns retained a public adjuster that assessed the damage to be $138,284.73. A genuine dispute existed as to the scope and repair cost of the damage.

c. The Bester-Nunns retained a certified mold assessment consultant to evaluate the dwelling. The consultant found Category 2 and Class 4 water damage and advised that the home should not be occupied during the mitigation/remediation work until the home was restored to its pre-damaged condition.

d. A public adjuster submitted an email to Travelers requesting extended ALE authorization also stating that he had been on site several times and the environment was very toxic—so much so that Hawkins' breathing became labored and he developed itchy eyes each time he spent even a few minutes inside the home. He also communicated that the initial payment was not sufficient to continue remediation and repairs and had to be discontinued.

e. Law denied Bester-Nunn's request for extended ALE coverage despite evidence the home was toxic and uninhabitable, stating the "home was fit to live in". According to Law, "During the [January 23, 2023] inspection we advised we would approve 4 additional weeks of housing only once the work was scheduled to start. The home was fit to live in based on the inspection as the kitchen worked, the home was dry, and everything worked. While the flooring would eventually need replacement, this did not impede the ability to reside in the home until the work would be completed."

f. The Bester-Nunns's public adjuster made another request to Travelers asking them to reconsider their coverage and additional living expense decisions. Travelers rejected this request and further rejected the sworn Proof of Loss Statement in the total amount of $160,800.83.

215. Based on the evidence collected by the certified mold consultant and the anecdotal evidence presented by the public adjuster, the Bester-Nunn's home was not "fit to live in". Since Travelers' initial payment was insufficient to remediate and repair the home, the home would continue to be unfit to live in. The only path offered by Travelers required the Bester-Nunns to take personal financial responsibility for the remainder of the remediation and repairs. Further, Travelers denied authorization of additional Loss of Use benefits until the work resumed, and then only authorized Loss of Use benefits for a period of four weeks, confirming Travelers commitment to Travelers scope.

216. The offense pleaded is the attempt. The Bester-Nunns had a contractual right under their policy to Loss of Use benefits when a covered loss rendered the residence premises "not fit to live in". The property obtained or sought through this conduct included at least: (a) benefits and/or claims to benefits for Coverage D (Loss of Use); and (b) benefits and/or claims to benefits for Coverage A (Dwelling). These items reduced Travelers' claims expenditures and/or extinguished a portion of its liability for one or more claims.

**Predicate Act #9: Extortion of a similar third-party insured on or about December 12, 2025 — violation of 18 U.S.C. § 1951.**

217. Upon information and belief, on or about December 12, 2025, a Travelers' representative extorted and/or attempted to extort insureds Austin Shearman and Amanda Shearman by improperly denying Loss of Use benefits. The RICO enterprise is Travelers. Shearman v. Travelers Personal Insurance Co., No. 2:26-cv-00080 (D. Mont. Aug. 12, 2026) alleges the following:

218. On May 29, 2025, a fire began in the Shearman's basement, damaged the home and its contents, and spread combustion byproducts through the house. The fire rendered the residence an unfit place to live for the Shearmans and their children, including a newborn child.

219. As alleged in the complaint, Travelers arranged and paid for temporary housing through a housing vendor, engaged ServiceMaster Restoration for demolition, and designated Sedgwick adjuster David Garza to assess the damage. Travelers eventually issued a scope of loss on August 21, 2025. The Shearmans engaged Restoration Consulting to analyze and recommend a cleaning and deodorizing protocol. Sometime prior to December 12, 2025, the Shearmans retained a public adjuster and submitted a reconstruction scope greater than Travelers' estimates. The Shearmans allege that estimates and payments from Travelers do not amount to the full dwelling and personal property losses.

220. On December 4 and December 12, the housing vendor asked Travelers to approve an extension of the Shearman's housing through January 15, 2026, "as the repairs to their home isn't complete."

221. On December 12, Travelers admits (Answer ¶32) that it denied a request to extend the Shearman's temporary housing benefits, writing that "Travelers admits that it denied Plaintiffs' request to extend temporary housing based on its determination that the Property was habitable following the completion of cleaning." The Shearmans (¶29) allege the contents of this denial as "the cleaning of the home is finished"; that "[a]ccording to the cleanup company's scope of work there is no destruction/demolition done to the main level of the home"; that "[t]herefore, the home would be deemed habitable again"; and that any remaining repair work "would not impact the

insureds [sic] ability to reside in the home." Travelers terminated loss of use benefits before either Policy limitation on those benefits was reached.

222. The same day, Shearman's public adjuster advised Travelers in writing that "cannot move into their home, as they have not been able to do the remaining work, or replace damaged furnishings." Travelers did not assign a contents adjuster for personal property inspection until about a month later, in January 2026.

223. Therefore, at the time of the Loss of Use benefits denial, Travelers knew that a) the status of repairs and cleaning of the house was incomplete and/or disputed, b) both the housing company and the public adjuster stated that the repairs on the house were not complete, c) the public adjuster stated that the Shearmans could not move into their home, d) a dispute existed over dwelling and personal property coverage, e) personal property adjuster had not been assigned by Travelers, and f) Loss of Use coverage limits had not been reached.

224. As a result of this Loss of Use benefits denial, the Shearmans allege emotional distress.

225. The offense pleaded is the attempt. The Shearmans had a contractual right under their policy to Loss of Use benefits when a covered loss rendered the residence premises "not fit to live in". The property obtained or sought through this conduct included at least: (a) benefits and/or claims to benefits for Coverage D (Loss of Use); and (b) benefits and/or claims to benefits for Coverage A (Dwelling) and Coverage C (Personal Property). These items reduced Travelers' claims expenditures and/or extinguished a portion of its liability for one or more claims.

**Predicate Act #10: Extortion of a similar third-party insured on or about February 20, 2018 — violation of 18 U.S.C. § 1951.**

226. Upon information and belief, on or about February 20, 2018, Travelers' adjuster Mike Boone extorted and/or attempted to extort insureds Randy Randel and Debra Randel by improperly denying Loss of Use benefits. The RICO enterprise for this Predicate Act is Travelers Lloyds of Texas Insurance Company ("Travelers Lloyds"), a wholly owned subsidiary of Travelers Indemnity that issued the Randel policy. Boone conducted Travelers Lloyds' affairs through racketeering activity. Boone is distinct from the enterprise as a natural person employed within the

Travelers claims infrastructure but separate from the policy-issuing entity. Randel v. Travelers Lloyds of Texas Insurance Co., S.D. Tex. No. 4:19-cv-2883, 9 F.4th 264 (5th Cir. 2021), later appeal No. 25-20231 (5th Cir. Aug. 17, 2026) alleges the following:

227. On July 4, 2017, a garage fire caused fire, heat, water, smoke, and soot damage throughout Randy and Debra Randel's home. Travelers' initial inspection recognized smoke damage beyond the immediate fire area and anticipated that the Randels would require long-term temporary housing. Travelers initially valued the dwelling loss at approximately $179,232.16 RCV and paid $126,720.86 ACV. The Randels disputed that estimate and obtained an Air Intellect environmental assessment. That assessment documented that the residence had been uninhabitable after the fire, that hazardous fire soot had permeated every area of the residence including concealed wall cavities and the HVAC system, and that current and future occupants, particularly children and the elderly, should be warned of the condition unless comprehensive removal was performed. The Randel's public adjuster estimated dwelling damage at $499,448.69, which Travelers did not accept.

228. On January 8, 2018, Travelers communicated that the loss-of-use benefits would not be extended beyond the existing lease. On January 31, 2018, Travelers received the public adjuster's dwelling estimate. On February 13, Travelers extended loss-of-use benefits to April 16. Traveler's housing provider, ALE Solutions, simultaneously informed the Randels that if they stayed after April 16, they would have to pay for housing themselves.

229. On February 20, 2018, in a written communication from Boone that was transmitted to the insured's public adjuster, Travelers stated: "At this time, we feel the Travelers rebuild estimate is fair, customary, and reasonable to account for, and fully resolve, the damages observed. ... We are unable to account for ongoing damages which have occurred due to the lack of action taken following the dismissal of Blackmon Mooring. As we have advised prior, we are also unable to extend Additional Living Expense (ALE) benefits for any unreasonable issues ... we will not be extending ALE benefits further." This communication by Travelers declared the insurer's estimate

sufficient to "fully resolve" the loss, refused the insureds' demand, and withdrew housing benefits, resting both decisions on the same premise about the insureds' conduct of the claim.

230. This decision by Travelers employed fear of economic loss, specifically the loss of housing. Fear of economic loss is "fear" within the meaning of § 1951(b)(2). The insured wrote: "There have been NO repairs begun on my house which Travelers clearly knows. I am sure I will need housing for at least 6-9 more months."

231. The underlying issue was the dispute over scope/value. The Randels disputed the scope and/or value of Travelers' estimate, making agreed repairs difficult to impossible. When on February 20, 2018, Travelers declared their estimates "fair, customary, and reasonable to account for, and fully resolve, the damages observed", Travelers was unilaterally declaring their dwelling estimates to be correct and therefore the termination of ALE to be proper. An appraisal panel later disagreed with Travelers, finding an appropriate estimate to be $367,956.73 RCV. The Fifth Circuit recorded in 2021 that Travelers "concedes that its preappraisal payment was not reasonable."

232. Therefore, at the time of the loss-of-use benefits denial, Travelers knew that a) the dwelling estimate was disputed, their estimate being about 36% of the public adjuster's estimate, b) the repairs on the house were not complete, c) the Randels were estimating an additional six to nine months to complete the repairs, d) an indoor-environmental assessment from Air Intellect environmental assessment documented that the residence had been uninhabitable after the fire and that hazardous fire soot had permeated every area of the residence, and e) Loss of Use coverage limits had not been reached.

233. The offense pleaded is the attempt. By employing the fear of economic loss of housing, Travelers knowingly created substantial financial pressure at precisely the point when the insureds were challenging Travelers' loss valuation. The Randels had a contractual right under their policy to Loss of Use benefits when a covered loss rendered the residence premises "not fit to live in". The property obtained or sought through this conduct included at least: (a) benefits and/or claims to benefits for Coverage D (Loss of Use); and (b) benefits and/or claims to benefits for Coverage

A (Dwelling) and Coverage C (Personal Property). These items reduced Travelers' claims expenditures and/or extinguished a portion of its liability for one or more claims.

234. Predicate Act #10 demonstrates that the same extortionate method was deployed through a different Travelers policy-issuing entity — Travelers Lloyds — using the same shared claims infrastructure operated by Travelers Indemnity, further evidencing that the racketeering pattern was embedded in the enterprise's institutional operations rather than confined to a single issuing company.

***RICO Case Statement 6: The RICO Enterprise***

235. Primary enterprise (legal entity): The enterprise alleged for Counts 10 and 11 is Travelers Personal Insurance Company, a legal entity within the meaning of 18 U.S.C. § 1961(4). The § 1962(c) "persons" are Ramseier (natural person, employed by Travelers Indemnity) and Travelers Indemnity (affiliated corporation). Both persons are formally distinct from the enterprise for § 1962(c) purposes. Ramseier is a natural person employed by a different corporate entity from the enterprise. Travelers Indemnity is a separate Connecticut corporation from Travelers Personal. The companies share common ownership through TIGHI but have separate charters, separate NAIC designations, separate ownership chains, and separate functional roles. Ramseier and Travelers Indemnity each participated in the operation and management of Travelers Personal's affairs by directing inspections, preparing and transmitting estimates, authorizing ALE, and communicating coverage positions — all on behalf of Travelers Personal, using Travelers Indemnity's personnel and email systems.

236. Alternative enterprise (association-in-fact): In the alternative, the enterprise is the association-in-fact of Travelers Personal Insurance Company, The Travelers Indemnity Company, and Travelers Lloyds of Texas Insurance Company, functioning as a continuing unit to process first-party residential property-damage claims. The association-in-fact enterprise has: (a) a common purpose — adjusting first-party residential property-damage claims, through which the racketeering conduct was embedded; (b) an ongoing organization — a shared claims infrastructure through which Travelers Indemnity employs and deploys adjusters to handle claims for multiple

affiliated policy-issuing entities, including Travelers Personal and Travelers Lloyds, using Travelers Indemnity's email domain and servers to transmit coverage communications; and (c) continuity as a unit — the three entities have maintained this structure across multiple claims, adjusters, and states over a period of years. The enterprise affects interstate commerce: Travelers Personal and Travelers Lloyds collect premiums and pay claims across state lines; Travelers Indemnity's email servers transmitted claims communications from Washington, Virginia, Iowa, and Texas; and all three entities are wholly owned subsidiaries or sub-subsidiaries of a NYSE-listed holding company (TRV) operating in all 50 states. Under the association-in-fact theory, Ramseier is the § 1962(c) "person" who conducted the enterprise's affairs through racketeering. Ramseier is distinct from the association because he is a natural person employed within it, not the association itself.

***RICO Case Statement 7, 8: Distinction From Legitimate Operations***

237. The pattern of racketeering activity differs from the enterprise's legitimate daily activities. The enterprise's legitimate daily claims-adjustment operations—property inspections, ALE authorizations, estimate production—were the *vehicle* through which the racketeering was conducted. The racketeering *conduct*—threats of death, physical violence to coerce settlement acceptance, using fear of economic harm to coerce settlement acceptance, and knowing transmission of false coverage classifications to mislead the insured—was criminal activity committed within insurance operations but distinct from them in legal character. Plaintiffs allege that criminal acts were carried out within insurance operations to obtain property from insureds by threats and deception. The vehicle is insurance; the conduct is crime.

***RICO Case Statement 9: Enterprise Benefit***

238. The RICO enterprise benefits from the pattern of racketeering activity by reducing claim expenses and/or extinguishing liability for claims, thus increasing overall profitability. Upon information and belief, the RICO person Ramseier benefits from the pattern of racketeering by maintaining and advancing his employment and position as an employee of the Travelers. Travelers Indemnity benefits from the pattern by maintaining its claims-handling relationship with

Travelers Personal and preserving the shared-services infrastructure through which its employees are deployed to adjust Travelers Personal's claims — a relationship that depends on keeping claim costs low. Other benefits accruing to the RICO enterprise and RICO persons may be revealed through discovery.

***RICO Case Statement 10: Interstate Commerce***

239. The racketeering activities wrongfully obtain proceeds and/or release of liability of claims from insured parties to benefit Travelers, which operates throughout interstate commerce. The affected parties include interstate insureds, contractors, attorneys, other insurance companies, taxing authorities, real estate concerns, and other parties.

***RICO Case Statement 11-12***

240. Does not apply.

***RICO Case Statement 13: Information on alleged violation of 18 U.S.C. § 1962(c)***

241. See previous RICO Case Statements, especially RICO Case Statement 6.

***RICO Case Statement 14: Information on alleged violation of 18 U.S.C. § 1962(d)***

242. Ramseier, Travelers Indemnity, and Travelers Personal, acting through employees and agents to be identified through discovery, agreed that Ramseier and Travelers Indemnity would conduct Travelers Personal's affairs through the pattern described above, or knowingly agreed to facilitate that conduct. The inter-corporate agreement between Travelers Personal and Travelers Indemnity — two separate legal entities, not a single corporation and its agent — satisfies the conspiracy requirement of § 1962(d). The agreement is evidenced by: (a) Travelers Personal assigned the Claim to a Travelers Indemnity employee (Ramseier) and accepted his work product as its coverage positions; (b) Travelers Indemnity provided the email infrastructure through which the wire fraud predicates were transmitted; (c) Travelers Personal reviewed and reaffirmed the microbial classification at levels above Ramseier; (d) Travelers Indemnity took no action to discipline or reassign Ramseier after the October 21 threats; (e) a separate Travelers claims representative (Matthew Law), a Sedgwick adjuster deployed by Travelers (David Garza), and Travelers adjuster Mike Boone independently deployed the identical extortionate method on

different claims involving different Travelers policy-issuing entities, demonstrating institutional agreement that the approach is acceptable across the Travelers corporate family; and (f) Travelers' post-extortion institutional ratification — Travelers accepted the concessions Ramseier extracted, extended ALE only after the Smiths complied with the extortionate demands, and maintained the microbial classification as its institutional coverage position for over eighteen months without correction, evidencing that the extortion was conducted with institutional agreement rather than in spite of it. This institutional conduct is independent of the estimate transmissions and remains evidence of the conspiracy even if the wire-fraud predicates are dismissed.

243. As evidenced by the predicates in which Travelers is the enterprise and the RICO person is someone other than Ramseier, Travelers continues to act through a pattern of racketeering in cases with other insured parties.

244. Plaintiffs will identify by name the Travelers employees who reviewed and approved the classification, and the dates on which they did so, following production of the claim file and the internal review records referenced in Ramseier's October 21, 2024, statements.

***RICO Case Statement 15: Alleged Injury to Business or Property***

245. See RICO Case Statement 4.

***RICO Case Statement 16: Relationship between the Alleged Injury and violation of the RICO statute***

246. The pattern of racketeering caused Plaintiffs direct and indirect injury. The predicate acts — threats, extortion, and fraud — proximately caused the injuries described above.

***RICO Case Statement 17: Damages***

247. The precise quantification of damages is still being determined. The pattern of racketeering is not merely directed at specific disputed items but is indicative of a posture by Defendants in which outstanding dwelling damages, contents damages, and additional living expenses are not allowable and have not been compensated. In addition, damages exist related to loss of health, loss of opportunity, and the other claims asserted in this Complaint. Damages uniquely attributable to the RICO claims include: loss of property from extorted assumption of remediation costs; loss of

income from coerced self-remediation; loss of business opportunities (Injury Q), as described in the Statement of Facts and Injury Definitions; and severe emotional distress caused by the threats constituting the extortion predicates.

***RICO Case Statement 18: Additional Information***

248. See the other paragraphs in this Amended Complaint for context and additional details

## V. Causes of Action

249. Each Count below incorporates by reference the paragraphs of Sections I (The Parties), II (Jurisdiction and Venue), III (Statement of Facts), and IV (RICO Case Statement) of this Complaint. No Count incorporates the allegations of any other Count, except where a Count expressly refers to a specific other Count for a stated purpose. The Primary Conduct designation at the head of each Count identifies the factual categories in Section III that principally support that Count; it does not limit the facts incorporated. In order to facilitate the identification of specific injuries attributable to specific conduct and to ensure compliance with the one-satisfaction rule, each count below identifies: (a) the primary conduct category it addresses; (b) the defined injuries (using the labels established in G: Injury Definitions and Classification) for which it seeks compensatory recovery; and (c) any injuries for which it serves as an alternative or overlapping theory (recoverable only once under whichever count affords the greatest recovery). Where a defined injury appears in more than one count, it is compensated only once—the multiple counts provide alternative theories of liability and alternative enhancement mechanisms, not cumulative recoveries.

250. The state-law counts (Counts 1–9) are asserted against Travelers Personal and Travelers Indemnity only. Counts 1, 2, and 4 are asserted against Travelers Personal only.

### A. Count 1 — Breach of Contract (Against Defendant Travelers Personal)

*Primary Conduct: Category A (Systemic Claims-Handling Failures) Primary Injuries: Unpaid Policy Benefits (Injury A)*

251. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

252. Travelers Personal had a contract of insurance with Plaintiffs. Travelers Personal breached the Policy by wrongfully denying and underpaying the Claim. Travelers Personal also misclassified approximately $32,268.37 in water-damage-related remediation as "microbial damage" and failed to apply or evaluate Additional Coverage 16.d and Special Provisions—Texas, Exclusion 11, as set forth in the Statement of Facts. Travelers Personal also failed to evaluate or apply Additional Coverage 12 (Ordinance or Law), which provides up to 10% of Coverage A ($100,000) for increased costs from ordinance or law enforcement. Travelers Personal's estimates represented only 25.9% of presently estimated restoration costs, and Travelers Personal otherwise failed to indemnify Plaintiffs for covered losses. Plaintiffs were damaged in the amount of Injury A (unpaid policy benefits)—presently estimated at $978,248.64 plus $150,144.00 in estimated additional living expenses, subject to applicable Policy limits. This Count does not seek recovery for any independent injury under *Stoker*/*Menchaca*; it seeks the contractual remedy of Policy proceeds wrongfully withheld.

**B. Count 2 — Prompt Payment of Claims Statute (Tex. Ins. Code § 542.051 et seq.) (Against Defendant Travelers Personal)**

*Primary Conduct: Category A (Systemic Claims-Handling Failures) Primary Injuries: Time-Value Loss From Delayed Payment (component of Injury A)*

253. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

254. Travelers Personal violated the deadlines and requirements of Subchapter B of Chapter 542 (Prompt Payment of Claims, §§ 542.051–542.061). Specifically: (a) Travelers Personal is liable for the Claim under the Policy, as alleged in Count 1; (b) under § 542.058(a), Travelers Personal received all items, statements, and forms it reasonably requested and required no later than November 29, 2024, when Plaintiffs delivered their detailed disputed-items letter with explanations, photographs, and the AMF estimates (see Travelers Answer, September 23, 2025,

¶48). Travelers Personal thereafter delayed payment of the Claim for more than 60 days, and as of the filing of this Amended Complaint has not paid the amounts owed under Coverage A, Coverage C, Coverage D, Additional Coverage 12 (Ordinance or Law), and the water-damage remediation misclassified as microbial. Partial payments do not relieve Travelers Personal of liability under § 542.060 for amounts it was obligated to pay and did not pay within the statutory period; (c) under § 542.056(a), (c), Travelers Personal did not, within 15 business days after receiving the items required to secure final proof of loss, notify Plaintiffs in writing of acceptance or rejection of the disputed items. It did not respond substantively to the November 29, 2024 disputed-items letter until February 21, 2025 (84 days), and that response was a revised estimate, not a written rejection stating the reasons as § 542.056(c) requires. Travelers Personal has never provided a written notice of rejection of the disputed portions of the Claim stating its reasons; and (d) these violations trigger damages under § 542.060.

255. Plaintiffs are entitled to statutory interest under § 542.060(a) at 18% per annum on the amount of the Claim from the date payment was due under § 542.058, plus reasonable and necessary attorneys' fees as set forth in Section 542.060 of the Texas Insurance Code. The statutory interest compensates for the time-value loss of delayed payment of Injury A and is compensatory rather than punitive.

256. Chapter 542A does not apply to this Claim because the loss was caused by an accidental plumbing discharge, not a force of nature, and Travelers Personal classified it in its August 8, 2024 contents estimate and all subsequent estimates as "Water Damage – Non-weather Related." Tex. Ins. Code § 542A.001(2)(C). Accordingly, the full 18% statutory interest rate under § 542.060(a), rather than the reduced rate under § 542.060(c), applies to any delayed payment.

257. In addition to the Prompt Payment violations, Travelers Personal violated the Unfair Claim Settlement Practices Act, Tex. Ins. Code § 542.003(b)(1), by knowingly misrepresenting to Plaintiffs pertinent facts and policy provisions relating to coverage at issue — specifically, by classifying water-related damage remediation as microbial damage in claim estimates dated September 2, 2024, October 1, 2024, November 1, 2024, and February 21, 2025, and transmitted

by email on or about September 3, 2024, October 3, 2024, November 4, 2024, and February 21, 2025, respectively, when Travelers Personal knew the damage resulted from Category 3 water and the classification was contradicted by the mold inspection report and Travelers Personal's own documented knowledge. This knowing misrepresentation suppressed the Claim's value and induced Plaintiffs to assume personal responsibility for remediation that the Policy obligated Travelers Personal to fund under dwelling coverage.

**C. Count 3 — Bad Faith / Deceptive Trade Practices Act ("DTPA") (Against Defendants Travelers Personal and Travelers Indemnity)**

*Primary Conduct: Category A (Systemic Claims-Handling Failures) and Category C (Fraudulent Inducement) Primary Injuries: Unpaid Benefits (Injury A); Public Adjuster Fees (Injury J); Mold Inspection Cost (Injury K); Opportunity Cost (Injury L); Betrayal Distress (Injury M)*

258. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

259. The claims against Travelers Indemnity in this Count relate back to August 6, 2025, as alleged in Relation Back and Timeliness as to Travelers Indemnity above, and are independently timely as alleged there.

260. Attribution of conduct. As used in this Count, "Travelers" refers to both Travelers Personal and Travelers Indemnity, each of which is independently liable. Travelers Personal is liable as the insurer that issued and sold the Policy, received and controlled the Claim, and adopted as its own coverage positions the estimates, classifications, and statements alleged in this Count. Travelers Indemnity is liable as a "person" engaged in the business of insurance under Tex. Ins. Code § 541.002(2), because it employed Ramseier, deployed him to adjust the Claim, and transmitted the estimates and communications alleged in this Count through its employee, email accounts, and mail servers; each act of Ramseier alleged in this Count was committed within the course and scope of his employment with Travelers Indemnity.

261. Defendant Travelers is required to comply with Chapter 541 of the Texas Insurance Code.

262. Pursuant to Tex. Ins. Code § 541.151, a person who sustains actual damages as a result of the practices defined as unfair in Chapter 541 may bring an action for those damages. Defendant Travelers violated Section 541.051 by misrepresenting the terms and/or benefits of the Policy—including representing, in claim estimates dated September 2, 2024, October 1, 2024, November 1, 2024, and February 21, 2025, that water-caused mold remediation was categorically subject to the $5,000 Limited “Fungi” or Other Microbes Remediation limit, contrary to Additional Coverage 16.d and Special Provisions—Texas, Exclusion 11, as set forth in the Statement of Facts.

263. Defendant Travelers violated Section 541.060 by: (1) Misrepresenting and/or failing to discuss with the Smiths pertinent facts or policy provisions relating to coverage, in violation of § 541.060(a)(1); (2) Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which liability was reasonably clear, in violation of § 541.060(a)(2)(A); (3) Failing to promptly provide a reasonable explanation of the basis in the Policy for the denial, in violation of § 541.060(a)(3); (4) Failing within a reasonable time to affirm or deny coverage, in violation of § 541.060(a)(4); (5) Refusing to pay the claim without conducting a reasonable investigation, in violation of § 541.060(a)(7); (6) The threatening and coercive conduct described below, which constitutes an extreme failure to effectuate a prompt, fair, and equitable settlement, in violation of § 541.060(a)(2)(A), and separately constitutes an unconscionable action under the DTPA, Tex. Bus. & Com. Code § 17.50(a)(3), as alleged below.

264. Defendant Travelers further violated Section 541.060(a)(2)(A) through the threatening and coercive conduct of its adjuster Benjamin Ramseier during the claims-handling process. On October 21, 2024, Ramseier threatened Plaintiffs with physical violence — including an offer of a "free hospital ride" — to coerce acceptance of Travelers' coverage position. Ramseier reinforced those threats by recounting, in the first person, a prior incident in which he threatened to kill another public adjuster by throwing him from a rooftop. In the same encounter, Ramseier extortionately conditioned Plaintiffs' acknowledged Additional Living Expense benefits on Plaintiffs' immediate personal assumption of responsibility for remediation work that Travelers was contractually obligated to fund. This conduct constitutes the most extreme breach of the duty

of good faith owed in the insurer-insured relationship. The threatening conduct is separately actionable as an unconscionable action under the DTPA, Tex. Bus. & Com. Code § 17.50(a)(3), as alleged below.

265. Defendant Travelers violated Section 541.061 by: (1) making untrue statements of material fact — specifically, classifying water-related damage remediation and reconstruction as microbial damage in claim estimates dated September 2, 2024, October 1, 2024, November 1, 2024, and February 21, 2025, and transmitted by email on or about September 3, 2024, October 3, 2024, November 4, 2024, and February 21, 2025, respectively, when Travelers knew the damage resulted from Category 3 water and the mold inspection report contradicted the classification; (2) failing to state material facts necessary to prevent misleading — specifically, concealing the consequences of the mold-report recommendation by failing to disclose that a mold assessment report would contain a remediation protocol, that the protocol would halt all mitigation until licensed remediation was performed, and that Travelers would classify and deny protocol-mandated work as microbial damage subject to the $5,000 fungus endorsement limit rather than as water-damage remediation payable under dwelling coverage; (3) making statements in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact — specifically, representing the mold-report recommendation as beneficial (stating that water-caused mold was a "moot point" because it would be covered) when the recommendation was designed to create a coverage trap that would shift approximately $50,000 to $70,000 in remediation costs to Plaintiffs; and (4) making a material misstatement of law — specifically, representing that all mold-protocol-mandated remediation was categorically subject to the $5,000 Limited "Fungi" or Other Microbes Remediation endorsement limit, when Additional Coverage 16.d and Special Provisions—Texas, Exclusion 11 of the Policy exclude mold resulting from water damage from the fungus endorsement and require that such remediation be paid under dwelling coverage. Travelers' interpretation of the Policy's coverage provisions was a misstatement of the contractual and legal obligations the Policy imposed, not merely a factual dispute about the cause of the mold.

266. At all material times, Plaintiffs were consumers who purchased insurance products from Defendant Travelers Personal and who sought and acquired, in connection with that purchase, the claims-adjustment services furnished by Travelers Indemnity through its employee Ramseier.

267. Defendant Travelers has violated the Texas DTPA by: (1) Representing that the agreement confers rights, remedies, or obligations which it does not involve; (2) Failing to disclose information intended to induce a transaction the consumer would not have entered into had the information been disclosed; (3) Threatening an insured with physical or financial harm to induce acceptance of unreasonable settlement terms, in violation of Tex. Bus. & Com. Code § 17.50(a)(3); (4) Engaging in an unconscionable action by taking advantage of Plaintiffs' lack of knowledge to a grossly unfair degree, in violation of § 17.50(a)(3).

268. Travelers' actions were committed "knowingly" as defined in § 541.002(1). As such, Plaintiffs are entitled to treble damages pursuant to the DTPA and Texas Insurance Code Section 541.152(a)–(b). The DTPA treble damages apply to the actual damages caused by the knowing violations, comprising the following defined injuries:

- Injury A — Unpaid policy benefits (contract damages recoverable as DTPA "actual damages");
- Injury J — Public adjuster fees (consequential economic loss from bad-faith handling);
- Injury K — Mold inspection cost (fraud-exclusive reliance cost);
- Injury L — Opportunity cost of the mold-report path (fraud-exclusive reliance loss);
- Injury M — Betrayal distress (fraud-exclusive emotional injury, to the extent *Stoker*-eligible).

The DTPA treble damages do not apply to the Category B compensatory base (Injuries E, F, G, H, I, P, R)—those injuries are addressed through the exemplary-damages or RICO-trebling enhancements under Counts 9 and 10–11.

269. In the alternative, and in addition to the injuries identified above, Plaintiffs assert that the following defined injuries are recoverable under this Count as independently compensable damages caused by Travelers' bad-faith threatening and coercive conduct, to the extent the Court determines that Counts 6 and 9 do not provide a separate vehicle for their recovery:

- Injury E — Mrs. Smith's Paralysis Episodes. Four near-fatal episodes of respiratory paralysis (December 20, 2024; January 15, 2025; February 20, 2025; March 10, 2025) caused by stress-induced biochemical depletion of Mrs. Smith's neuromuscular function. This injury is independently compensable as set forth in the Injury Definitions above because: (a) the predominant cause was Ramseier's threats of physical violence, which are independently tortious acts qualitatively distinct from any coverage determination; (b) the paralysis episodes would have occurred even if Travelers had paid every dollar of policy benefits in full on October 22, 2024, because payment of money does not eliminate the physiological fear response triggered by threats of imminent bodily harm; (c) the injury is a physical medical emergency, not an emotional state dependent on the coverage outcome; and (d) the 41-fold increase in episode frequency during the period of Defendants' most extreme conduct is temporally and causally linked to the threats, not to the nonpayment of benefits.
- Injury F — Fear of Physical Violence. The ongoing fear for physical safety experienced by both David and Misty Smith as a result of Ramseier's threats of bodily harm and his recounting of a prior death threat. This injury is independently compensable because fear of physical assault by a locally-residing adjuster who has demonstrated a predisposition to violence exists entirely apart from the coverage dispute and would persist regardless of whether all policy benefits were paid in full.
- Injury P — Coercion Submission Distress. The psychological harm of having been coerced into compliance with extortionate demands — including humiliation from forced degrading labor, helplessness from the absence of choice, anticipatory dread during the compliance period, and post-compliance recognition of having been exploited. This injury is independently compensable because it is caused by the act of coercion — a violation of personal autonomy — rather than by the subject of the coercion. The distress of being forced to perform demolition in a contaminated house under threat of homelessness is not cured by subsequent payment of policy benefits.

- Injury R — Increased Medical Expenses. The ongoing medical costs for treatment of Mrs. Smith's paralysis episodes and their consequences, including hypoxia-related brain injury evaluation, neurological monitoring, and continuing symptom management. This is a quantifiable economic loss consequential to Injury E, independently compensable because it is caused by threats of physical violence and would be incurred regardless of whether Policy benefits were paid in full.
- Injuries G, H, and I — Lost Business Income, Below-Market Property Sale, and Out-of-Pocket Remediation Costs. These quantifiable economic losses are consequential to the extortionate coercion and independently compensable because they are caused by extortion and threats of physical violence, not by the denial of policy benefits.

The foregoing injuries are pled in the alternative under this Count. Under the one-satisfaction rule, Plaintiffs do not seek duplicative recovery — these injuries are compensated only once, under whichever count affords the greatest recovery. DTPA treble damages under § 541.152(a)–(b) apply to the compensatory base established by the knowing violations alleged herein, including these alternative Category B injuries to the extent the Court allows their recovery under this Count.

**D. Count 4 — Breach of the Duty of Good Faith and Fair Dealing (Against Defendant Travelers Personal)**

*Primary Conduct: Category A (Systemic Claims-Handling Failures) Primary Injuries: Same as Count 3 actual damages*

270. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

271. This Count is asserted against Travelers Personal only, as the insurer under the Policy that owed Plaintiffs the common-law duty of good faith and fair dealing. Travelers Indemnity's liability for the conduct alleged in this Count is asserted under Counts 3, 5, 6, 8, 9, 10, and 11.

272. Travelers Personal's conduct constitutes a breach of the common-law duty of good faith and fair dealing arising from its insurance contract with Plaintiffs. Travelers Indemnity did not issue the Policy and is not alleged to have done so; it is liable on this Count only to the extent it

performed claims handling as Travelers Personal's agent and under the alternative agency and joint-enterprise theories alleged in The Parties above.

273. Defendant Travelers Personal's failure to adequately and reasonably investigate and evaluate Plaintiffs' Claim, although Travelers Personal knew or should have known by the exercise of reasonable diligence that its liability was reasonably clear, constitutes a breach of the duty of good faith and fair dealing.

274. Travelers Personal's actions were committed "knowingly" as that term is used in the Texas Insurance Code and was a producing cause of Plaintiffs' damages. This allegation supports the DTPA trebling enhancement under § 541.152(a)–(b) applicable to the alternative Category B injuries pled under this Count through Count 3; it does not impose a heightened scienter standard on the common-law duty of good faith and fair dealing, which requires only that the insurer knew or should have known that its liability was reasonably clear.

275. Defendant Travelers Personal's breach of the common-law duty of good faith and fair dealing encompasses not only its systemic failure to adequately investigate and pay the Claim, but also the manner in which it conducted the claims process — including the threatening and coercive conduct of the adjuster it assigned to the Claim, Ramseier. The duty of good faith in the insurer-insured relationship requires more than the timely payment of covered claims; it prohibits an insurer from using the claims process as a vehicle for threats of physical violence and extortionate coercion of its insured. Travelers Personal breached this duty when Ramseier, acting as Travelers Personal's agent in adjusting the Claim, threatened Plaintiffs with serious bodily harm, recounted a prior death threat to demonstrate willingness to follow through, and conditioned acknowledged ALE benefits on Plaintiffs' immediate personal assumption of responsibility for remediation — exploiting the Smiths' known medical vulnerability, housing dependency, and financial constraints to extract compliance. This conduct constitutes bad faith of the most extreme character and is qualitatively distinct from any legitimate coverage determination.

276. In the alternative, and in addition to the actual damages identified in Count 3, Plaintiffs assert that the following injuries are recoverable under this Count as independently compensable

damages, to the extent the Court determines that Counts 6 and 9 do not provide a separate vehicle for their recovery: Injury E (Mrs. Smith's paralysis episodes); Injury F (fear of physical violence); Injury P (coercion submission distress); Injury R (increased medical expenses); and Injuries G, H, and I (lost business income, below-market property sale, and out-of-pocket remediation costs). Each injury's independent compensability under *Stoker*/*Menchaca* is established by the allegations set forth in Count 3, alternative injuries, which are incorporated herein by reference. These injuries are pled in the alternative and are subject to the one-satisfaction rule — Plaintiffs do not seek duplicative recovery for any injury under more than one count.

**E. Count 5 — Negligence (Independent Damage and Injury) (Against Defendants Travelers Personal and Travelers Indemnity)**

*Primary Conduct: Categories A and C (Inspection Delay, PuroClean Scope Limitations, Mold-Protocol Refusal), with Category B conduct (Threats) as a foreseeable consequence of negligent adjuster deployment relevant to Injury E causation Primary Injuries: Additional Property Deterioration (Injuries B, C, D); Mrs. Smith's Paralysis Episodes (Injury E — as physical consequence of negligent conduct); Caregiving-Related Lost Business Income and Lost Earning Capacity (Injuries S, T — as consequences of Injury E)*

277. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

278. The claims against Travelers Indemnity in this Count relate back to August 6, 2025, as alleged in Relation Back and Timeliness as to Travelers Indemnity above, and are independently timely as alleged there.

279. Attribution of conduct. As used in this Count, “Travelers” refers to both Travelers Personal and Travelers Indemnity, each of which undertook to direct and control mitigation and remediation of the Property and is independently liable. Travelers Personal undertook that control as the insurer that received and controlled the Claim, authorized and limited vendor scope, and decided whether protocol-mandated work would be funded. Travelers Indemnity undertook that control through its employee Ramseier, who, within the course and scope of his

employment, inspected the Property, communicated scope limitations to PuroClean, recommended the mold assessment, and communicated the refusal to fund protocol-mandated work. Travelers Indemnity is also liable for Ramseier's negligent acts under respondeat superior.

280. This negligence claim seeks recovery for physical injury to tangible property and for bodily injury to Mrs. Smith—harms independent of and different from the contractual right to policy proceeds. It is therefore based on extra-contractual duties arising from Defendant Travelers' operational control and negligent undertaking and is not barred by the economic-loss rule, which does not preclude recovery for physical injury to property or persons, nor does it bar claims protecting interests different from the benefit-of-the-bargain under the Policy. In the alternative, to the extent applicable regulations required licensed performance of protocol-mandated remediation once a mold inspection report issued, Defendant Travelers' refusal to fund or authorize that work while simultaneously being knowingly aware of the halt in mitigation and taking no action to accomplish a remedy constitutes negligence per se, proximately causing the precise structural and contamination harms those regulations are intended to prevent.

281. Injuries B, C, and D are asserted against Travelers Personal as timely filed on August 6, 2025, and against Travelers Indemnity by relation back:

- Injury C — Additional property deterioration from the 27-day inspection delay: Ramseier delayed his initial inspection 27 days, resulting in further property damage independent of the damage caused by the original peril.
- Injury D — Additional property deterioration from PuroClean scope constraints: Travelers' influence over PuroClean's remediation scope caused wet materials to remain in the home, producing additional degradation.
- Injury B — Additional property deterioration from the mold-report halt: Without any recommendation from, and contrary to the observations of, its own contractor PuroClean, Travelers insisted the Smiths obtain a mold inspection report. When that report triggered a statutory remediation protocol, Travelers refused to pay for the work mandated by the protocol,

thereby halting all mitigation efforts for approximately 11 weeks. The mold contamination and water-related degradation worsened significantly.

Travelers' adjusters had a legal duty not to cause additional harm to the Property after the Claim was reported. As a direct result of Defendant Travelers' actions, the Smiths' home sustained additional, preventable damage. Independently of any obligation to pay policy benefits, Defendant Travelers voluntarily undertook to direct and control mitigation and remediation services at the Property—including selecting and managing vendors, dictating scope (what materials could be removed and when), recommending a mold inspection that would trigger a statutory protocol, deciding when work could proceed, and apparently, requiring PuroClean to "cooperate with the Insurer" as indicated in the July 20, 2024, Authorization to Perform Services. Having undertaken those services, Defendant Travelers owed Plaintiffs a common-law duty of reasonable care to perform them so as not to increase the risk of harm and not to cause additional physical damage to the Property and contents. Given known Category 3 water and microbial risks, additional harm from delay, scope constraints, and work stoppage was eminently foreseeable. Defendant Travelers breached that duty through affirmative misfeasance, including: (a) delaying the initial inspection for 27 days while porous assemblies remained saturated; (b) constraining PuroClean's scope so wet sheetrock, carpeting, bamboo flooring, tile, and contents remained in place; and (c) recommending a mold inspection knowing it would trigger a statutory protocol and then refusing to fund protocol-mandated work, thereby halting all mitigation for approximately 11 weeks. Industry standards and regulatory framework further define the standard of care. Water-damage mitigation and mold-remediation work is guided by IICRC S500 (Professional Standard and Reference Guide for Water Damage Restoration) and IICRC S520 (Standard for Professional Mold Remediation), which require prompt removal of water-damaged porous materials, containment and engineering controls, and continuous drying to prevent secondary damage. In Texas, once a mold assessment report with a remediation protocol issues, the former Texas Mold Assessment and Remediation Rules (TMARR), 25 Tex. Admin. Code §§ 295.321–295.338 (including, without limitation, §§ 295.322, 295.324, 295.326), 16 Tex. Admin. Code ch. 78 (including §§ 78.58,

78.100, 78.120), and Texas Occupations Code ch. 1958 required licensed performance of the protocol scope to prevent structural contamination and occupant exposure. Plaintiffs are within the protected class (homeowners/occupants), and the additional microbial load, moisture entrapment, and structural rot are the precise harms those rules address. By refusing to authorize or fund licensed remediation while knowing that unlicensed self-remediation would proceed under threat of ALE cutoff, Defendant Travelers caused a deviation from these standards and rules, a regulatory violation, and proximately caused the harms the rules exist to prevent.

Each of the property injuries (B, C, D) is an independent injury resulting from Defendant Travelers' negligent claims handling, not from the original covered loss itself. Each is temporally and causally distinguishable from the original water damage and from each other (different time periods, different causal mechanisms). Injury B is assigned to this Count rather than to Count 7 (Fraud) to avoid double-counting the mold-halt property deterioration; Count 7's damages are limited to fraud-exclusive reliance costs (Injuries K, L, M) that do not overlap with the property-deterioration recovery here. The mechanism-of-injury and temporal segregation include: leaving wet porous materials in place allowed bound water to migrate into adjacent assemblies, increasing microbial load and causing later sill-plate rot; the August–October work stoppage allowed odor compounds to permeate open-cell foam and subfloors; and the 27-day inspection delay permitted deeper saturation and colonization beyond the original peril. These injuries are temporally and causally distinct from the initial rupture. Consistent with these mechanisms, January 2026 remediation uncovered trapped ANSI/IICRC Class 4 (Bound) moisture under tile previously refused for removal, odor-permeated open-cell foam insulation, and sill-plate rot in walls. These physical conditions are temporally and mechanistically linked to the 27-day inspection delay, PuroClean scope constraints, and the 11-week protocol halt, not to the original water intrusion. Incremental negligence damages (segregated from contract benefits) include, without limitation, the following repair scopes attributable to delay, scope constraints, and the remediation halt: (i) removal and replacement of odor-permeated open-cell foam insulation in affected walls/ceilings; (ii) removal and replacement of subflooring and underlayment exhibiting secondary saturation;

(iii) demolition and replacement of sill plates and framing members exhibiting moisture-induced rot; (iv) additional selective demolition to remove tile and assemblies that trapped ANSI/IICRC Class 4 (Bound) moisture; (v) extended equipment time for negative-air, HEPA filtration, and dehumidification required by the prolonged condition; and (vi) odor abatement treatments beyond those required to restore to pre-loss condition. The reasonable and necessary cost to perform these incremental scopes is distinct from, and in addition to, the cost to remediate the original water intrusion.

282. The independent bodily injuries, and the damages consequential to them, recoverable under this Count are:

- Injury E — Mrs. Smith's paralysis episodes: Ramseier's direct threats of physical violence — the predominant cause, at least an order of magnitude greater than any other stressor — proximately caused a severe exacerbation of Mrs. Smith's pre-existing Normokalemic Periodic Paralysis, triggering four near-fatal paralysis episodes. The financial strain and loss of the home arising from Travelers' claims handling are alleged only as background stress (see Injury N), not as the operative cause of Injury E;
- Injury S — Mr. Smith's caregiving-related lost business income from April 2025 through approximately August 2026, as a consequence of Injury E;
- Injury T — Mrs. Smith's lost earning capacity from her art and greeting-card business, including the lost 2025 selling season, as a consequence of Injury E.

The threats of violence are recoverable under this negligence count because Travelers' deployment of an adjuster with a known predisposition to physical confrontation — without adequate training, supervision, or reassignment — made the threats and their physical consequences foreseeable to a reasonable insurer, particularly given Travelers' documented knowledge of Mrs. Smith's medical vulnerability. The threats are part of the foreseeability and causation analysis for this Count, not an independent breach element; the negligent breach is Travelers' institutional failure to hire, train, supervise, and deploy competent adjusters, as independently alleged in Count 8.

283. The threats of violence are recoverable under this negligence count because Travelers' deployment of an adjuster with a known predisposition to physical confrontation — without adequate training, supervision, or reassignment — made the threats and their physical consequences foreseeable to a reasonable insurer, particularly given Travelers' documented knowledge of Mrs. Smith's medical vulnerability. The threats are part of the foreseeability and causation analysis for this Count, not an independent breach element; the negligent breach is Travelers' institutional failure to hire, train, supervise, and deploy competent adjusters, as independently alleged in Count 8.

284. The bodily injury (E) represents a distinct physical injury independent of any owed policy benefits. Defendant Travelers knew of Mrs. Smith's fragile health and special needs. Despite this knowledge, Defendant Travelers deployed an adjuster who threatened the Smiths with physical violence, against a background of unreasonable delays and financial stress. Those threats were the predominant and direct proximate cause of the severe exacerbation, resulting in four near-fatal episodes of respiratory failure due to paralysis. Injury E's independence is established in the Injury Definitions above and in Count 3 (alternative injuries), which is incorporated herein by reference for that limited purpose. Injury E also appears in Count 6 (IIED) and Counts 10–11 (RICO); it is compensated once, with Plaintiffs electing the greatest available enhancement.

**F. Count 6 — Intentional Infliction of Emotional Distress (Against Defendants Travelers Personal and Travelers Indemnity)**

*Primary Conduct: Category B (Threatening and Coercive Acts) Primary Injuries: Mrs. Smith's Paralysis Episodes (Injury E); Fear of Physical Violence (Injury F); Coercion Submission Distress (Injury P); Medical Expenses (Injury R); Lost Income, Below-Market Sale, and Out-of-Pocket Costs (Injuries G, H, I — as consequences of coercion); Caregiving-Related Lost Business Income and Lost Earning Capacity (Injuries S, T — as consequences of Injury E)*

285. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

286. The claims against Travelers Indemnity in this Count relate back to August 6, 2025, as alleged in Relation Back and Timeliness as to Travelers Indemnity above, and are independently timely as alleged there.

287. IIED is viable here because the audio-recorded threats of imminent bodily harm and death during a claims inspection are qualitatively outside ordinary claims handling. This count seeks recovery solely for personal-safety harms arising from violent threats — fear of imminent bodily injury and the severe physiological sequelae of those threats in a medically vulnerable plaintiff — not for economic losses from Claim underpayment. Contract, Chapter 541/DTPA, and PPCA do not redress fear of assault or near-fatal medical episodes triggered by threats of violence.

288. Travelers' actions, committed through representative Benjamin Ramseier, were: (1) intentional or reckless; (2) extreme and outrageous; (3) caused Plaintiffs emotional distress; and (4) the emotional distress was severe. Specifically, the extreme and outrageous conduct includes: (a) threatening physical violence against the insured and his public adjuster to force acceptance of an unfair settlement; (b) recounting a prior threat to kill another public adjuster to demonstrate willingness to follow through on threats; (c) threatening to cut off additional living expenses to coerce Mr. Smith into performing demolition work in a contaminated house—exploiting the Smiths' known medical vulnerability and housing dependency to extract compliance with extortionate demands.

289. Travelers Personal is vicariously liable for the intentional torts of Ramseier under the actual-agency, apparent-authority, and borrowed-servant theories. Travelers Indemnity is independently vicariously liable for the intentional torts of its employee Ramseier under respondeat superior, as Ramseier was acting within the course and scope of his employment with Travelers Indemnity when interacting with the Smiths.

290. The defined injuries recoverable under this Count as independent injuries caused by the intentional infliction of emotional distress are:

- Injury E — Mrs. Smith's paralysis episodes and medical consequences (independently compensable; also alleged in Count 5);

- Injury F — Fear for physical safety, both Smiths (independently compensable);
- Injury P — Coercion submission distress (independence contested; asserted as caused by the act of coercion rather than by the subject);
- Injury R — Increased medical expenses for treatment of Injury E (independently compensable);
- Injury S — Mr. Smith's caregiving-related lost business income, as a consequence of Injury E (independently compensable);
- Injury T — Mrs. Smith's lost earning capacity, as a consequence of Injury E (independently compensable);
- Injury G — Lost business income from coerced diversion of labor *(*independently compensable);
- Injury H — Below-market property sale from coercion-induced financial duress (independently compensable);
- Injury I — Out-of-pocket remediation costs from coerced compliance (independently compensable).

Injuries N (generalized anxiety) and O (ALE displacement distress) are not asserted as independently compensable injuries under this Count because they are unlikely to satisfy the *Menchaca* independence requirement and are alleged solely as causal context for Injury E.

**G. Count 7 — Fraud / Fraudulent Inducement (Against Defendants Travelers Personal and Travelers Indemnity)**

*Primary Conduct: Category C (Fraudulent Inducement Regarding the Mold Report) Primary Injuries: Mold Inspection Cost (Injury K); Opportunity Cost of Mold-Report Path (Injury L); Betrayal Distress (Injury M)*

291. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

292. The claims against Travelers Indemnity in this Count relate back to August 6, 2025, as alleged in Relation Back and Timeliness as to Travelers Indemnity above, and are independently timely as alleged there.

293. Attribution of conduct. As used in this Count, “Travelers” refers to both Travelers Personal and Travelers Indemnity, each of which is independently liable. Ramseier made each representation and omission alleged in this Count in a dual capacity: as an employee of Travelers Indemnity acting within the course and scope of his employment, and as the adjuster assigned by Travelers Personal to act as its agent on the Claim. Travelers Indemnity is liable for Ramseier’s fraud under respondeat superior. Travelers Personal is liable because Ramseier made the representations as its authorized agent in adjusting the Claim, and because Travelers Personal adopted and acted on them by applying the microbial classification in its estimates and refusing to fund protocol-mandated remediation.

294. Between July 24 and July 26, 2024, in telephone conversations with Mr. Smith, Travelers, through Ramseier, recommended that the Smiths retain a mold assessment consultant. Ramseier made this recommendation without any recommendation from, and contrary to the observations of, PuroClean, which had sent Ramseier photographs and reported minimal visible mold in water-damaged areas only. In the same telephone conversations, Ramseier affirmatively represented that any mold caused by the water damage was a "moot point,” because mold caused by the water loss would be covered by dwelling benefits provided as a result of the water damage loss. Plaintiffs plead two independent bases for fraud arising from these conversations: (a) affirmative misrepresentation and (b) fraud by nondisclosure.

295. Affirmative misrepresentation. The “moot point” representation was false when made. Travelers did not intend, at the time Ramseier made it, to pay water-caused mold remediation under dwelling benefits. Travelers’ contemporaneous intent is shown by the following facts: (i) after PuroClean halted mitigation on August 5, 2024, a conference call took place because PuroClean could not continue, a new and substantially more expensive licensed mold remediation contractor was required, Travelers would not pay for that contractor, and the

condition of the Property was getting worse — Travelers thus refused within days of the representation to pay for the very water-caused mold remediation it had represented would be covered; (ii) Travelers' first estimate, dated September 2, 2024, applied the microbial classification to water-caused mold approximately five weeks after the representation, while simultaneously classifying the water as ANSI/IICRC Category 3; and (iii) other Travelers adjusters deployed the same method on separate claims, as alleged in Predicate Acts #8 through #10, indicating a pre-existing claims practice rather than a later change of position.

296. Fraud by nondisclosure. Independently, having affirmatively recommended a mold assessment and represented that water-caused mold was a "moot point," Travelers had a duty to disclose the material facts in its possession that made those statements misleading: that a mold assessment report would contain a remediation protocol; that the protocol, once issued, would legally require licensed remediation before PuroClean could continue mitigation; and that Travelers would treat protocol-mandated work as "microbial" remediation subject to the $5,000 endorsement limit rather than as water-damage remediation payable under dwelling coverage. Travelers had superior knowledge of the legal effect of a mold protocol and of its internal classification practice. Travelers remained silent on these facts, knowing the Smiths were ignorant of them and intending that the Smiths act on the recommendation. The material misrepresentation and nondisclosure were known to Travelers and Ramseier to be false or misleading, or were asserted without knowledge of their truth, and were intended to be acted on.

297. The Smiths relied on Travelers' recommendation, obtained the report, and were directly harmed. The defined injuries recoverable under this Count are fraud-exclusive reliance damages—distinct from both the policy benefits in Count 1 (Injury A) and the negligence property damage in Count 5 (Injuries B, C, D):

- Injury K — Mold inspection cost: the direct cost incurred in reliance on the fraudulent recommendation (a reliance expenditure the Smiths would not have incurred but for the misrepresentation);

- Injury L — Opportunity cost of the mold-report path: the additional time, expense, and property deterioration attributable to the detour through the mold-report process versus the PuroClean-continuation path that would have been followed absent the misrepresentation (a reliance-based loss measured by a different counterfactual baseline than Count 5's negligence damages);
- Injury M — Betrayal distress: the emotional harm of discovering that Travelers' recommendation was designed to create a coverage trap (a fraud-exclusive emotional injury partially independent under *Stoker*/*Menchaca*).

These damages are separate from the underlying policy benefits. Injury B (additional property deterioration during the mold-report halt) is NOT sought under this Count—it is assigned to Count 5 to avoid double-counting. This Count's damages are limited to the fraud-exclusive reliance costs that Count 5 does not capture.

**H. Count 8 — Negligent Hiring, Supervision, and Retention (Against Defendants Travelers Personal and Travelers Indemnity)**

*Primary Conduct: Travelers' Institutional Failure to Hire, Train, and Supervise (derivative of Category B) Primary Injuries: All injuries flowing from Ramseier's specific misconduct (Injuries B through I, P, R — as but-for consequences of the hiring/retention decision)*

298. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

299. The claims against Travelers Indemnity in this Count relate back to August 6, 2025, as alleged in Relation Back and Timeliness as to Travelers Indemnity above, and are independently timely as alleged there.

300. Travelers had a duty to hire, train, and supervise competent and fit adjusters. Travelers breached this duty by assigning a new, improperly trained, and inexperienced adjuster to a catastrophic loss and then failing to supervise him. Travelers hired an inexperienced adjuster who made poor claims decisions and made threats of physical violence. Travelers knew or should have known Ramseier was unfit, especially given his predisposition and background where he " spent

ten years putting my hands on people." Travelers' failure to hire, train, and supervise Ramseier worsened the property damage, resulted in the intentional infliction of emotional distress, mental anguish, Mrs. Smith's injuries, and flows directly from Travelers' negligence in entrusting the Claim to Ramseier.

301. This Count serves as an alternative theory of Travelers' institutional liability for the injuries caused by Ramseier's specific misconduct. Under the one-satisfaction rule, Plaintiffs do not seek duplicative recovery for injuries already compensated under Counts 5 or 6—but this Count provides an independent basis for Travelers' liability to the extent respondeat superior under Count 6 is contested.

302. Travelers Indemnity, as Ramseier's direct employer, had the primary duty to hire, train, and supervise competent and fit adjusters. Travelers Indemnity breached this duty by hiring an adjuster with a predisposition to physical confrontation, assigning him to catastrophic residential losses without adequate training or supervision, and retaining him after the October 21, 2024 threats without discipline, reassignment, or remedial action. Travelers Personal, which accepted and relied upon Travelers Indemnity's shared-services deployment of Ramseier, is independently liable for negligently entrusting the Claim to an adjuster provided by Travelers Indemnity without ensuring adequate hiring and supervision standards, particularly after the October 21, 2024 conduct was or should have been known to Travelers Personal. Travelers Indemnity's negligent retention and supervision after October 21, 2024—keeping Ramseier on the Claim without discipline or reassignment through at least February 21, 2025—is independently timely as alleged in Relation Back and Timeliness as to Travelers Indemnity above.

**I. Count 9 — Gross Negligence (Against Defendants Travelers Personal and Travelers Indemnity)**

*Primary Conduct: Category B (Threatening and Coercive Conduct) and Categories A and C (Grossly Negligent Claims Handling Causing Independent Property Damage) — supporting exemplary damages Primary Injuries: Injuries E, F, G, H, I, P, R, S, T (Category B compensatory*

*base) and Injuries B, C, D (independent property deterioration — caused by Category A/C conduct that independently satisfies § 41.003)*

303. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

304. The claims against Travelers Indemnity in this Count relate back to August 6, 2025, as alleged in Relation Back and Timeliness as to Travelers Indemnity above, and are independently timely as alleged there.

305. Attribution of conduct. As used in this Count, "Travelers" refers to both Travelers Personal and Travelers Indemnity, each of which is independently liable for exemplary damages based on its own conduct and knowledge, not solely on Ramseier's. As to Travelers Personal: according to Ramseier, the ALE conditioning and microbial classification were subject to review by general counsel and decision-makers "seven levels above" him; Travelers Personal reviewed the disputed classification and reaffirmed it; and Travelers Personal granted later ALE extensions only after the Smiths complied with the extortionate demands, thereby authorizing and ratifying the conduct. As to Travelers Indemnity: as Ramseier's employer, it retained him on the Claim without discipline, reassignment, or remedial action after the October 21, 2024 threats through at least February 21, 2025, and continued to transmit the reaffirmed classification through its employee, email accounts, and mail servers, thereby ratifying the conduct.

306. Travelers' conduct constitutes gross negligence through two independently sufficient grounds. First, Travelers' threatening and coercive conduct — including threatening an insured with physical or financial harm to induce the Smiths into accepting unreasonable settlement terms — involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Second, Travelers' systemic claims-handling failures — delaying the initial inspection for 27 days while porous assemblies remained saturated, constraining PuroClean's remediation scope so that wet materials remained in place, and refusing to fund protocol-mandated remediation for approximately 11 weeks while knowing the Property was deteriorating and Mrs. Smith was medically vulnerable — independently involved an extreme degree of risk of the same

character. As to both grounds, Travelers, by and through its employees and agents, had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, or welfare of others.

307. This Count exists primarily as a vehicle for exemplary damages under Texas Civil Practice & Remedies Code § 41.003. The compensatory base for Injuries E, F, G, H, I, P, R, S, and T is established by the underlying tort liability in Counts 5, 6, and 8; the compensatory base for Injuries B, C, and D is established by Count 5 (Negligence), which independently establishes that Travelers' claims-handling conduct was tortious — this Count's gross negligence finding elevates the enhancement from ordinary compensatory damages to exemplary damages under § 41.003. The exemplary damages sought under this Count apply to the following compensatory base:

- Injury E — Mrs. Smith's paralysis episodes;
- Injury F — Fear of physical violence;
- Injury G — Lost business income;
- Injury H — Below-market property sale;
- Injury I — Out-of-pocket remediation costs;
- Injury P — Coercion submission distress;
- Injury R — Increased medical expenses;
- Injury S — Mr. Smith's caregiving-related lost business income;
- Injury T — Mrs. Smith's lost earning capacity;
- Injuries B, C, D — Additional property deterioration (arising from Category A/C claims-handling conduct that independently satisfies the § 41.003 gross negligence standard, as alleged above).

The exemplary damages under this Count address Defendants' grossly negligent conduct through both grounds alleged above: the threatening and coercive conduct (Category B) and the systemic claims-handling failures causing independent property damage (Categories A/C). Injuries B, C, D are included in the exemplary-damages compensatory base because the claims-handling conduct that caused them — knowingly allowing the Property to deteriorate for months while the Smiths

were displaced and Mrs. Smith was medically vulnerable — independently satisfies § 41.003's gross negligence standard. The gross negligence alleged in this Count is not predicated on the bad-faith or deceptive-trade-practice evidence alleged in Counts 3 and 4; it rests on conduct that exceeds those standards — threats of deadly violence to coerce an insured into self-remediation, and deliberate inaction in the face of known, ongoing property destruction and known medical vulnerability — each rising to the level of conscious indifference to the rights, safety, and welfare of others, as required by § 41.003(a)(3) and distinct from the showing excluded by § 41.003(b). No single compensatory base receives both DTPA trebling and exemplary damages: Injury A and Injury J receive DTPA trebling under Count 3; Injuries B, C, D receive exemplary damages under this Count; and neither set of injuries receives both enhancements.

**J. Count 10 — RICO: 18 U.S.C. § 1962(c) (Against Defendants Ramseier and Travelers Indemnity)**

*Primary Conduct: Category B (Extortion Predicates #1–3) and Category C (Wire Fraud Predicates #4–7) Primary Injuries: Loss of Property (Injuries G, H, I, R; Injuries K, L — as losses caused by Wire Fraud Predicates #4–7); Loss of Income (Injuries G, S); Personal Injuries Generating Business/Property Loss (Injuries E, F — as causal predicates of economic injuries, not as standalone compensable harms); Loss of Business Opportunities (Injury Q)*

308. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above as if fully set forth herein, but do not incorporate the allegations of any preceding Count.

309. The claims against Travelers Indemnity in this Count relate back to August 6, 2025, as alleged in Relation Back and Timeliness as to Travelers Indemnity above, and are independently timely under the four-year RICO limitations period recognized in Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143 (1987), regardless of relation back, as alleged there.

310. Ramseier and Travelers Indemnity each conducted the affairs of the enterprise Travelers Personal through a pattern of racketeering activity, as detailed in the RICO Case Statement above. Specifically, Ramseier conducted Travelers Personal's affairs through a pattern of violations of 18 U.S.C. § 1951 (extortion) and 18 U.S.C. § 1343 (wire fraud). Travelers Indemnity independently

conducted the enterprise's affairs through the same pattern by employing and deploying Ramseier, operating the email infrastructure through which the wire fraud predicates were transmitted, maintaining Ramseier without discipline after the October 21, 2024 threats, and ratifying the fraudulent classification.

311. As a result of Defendants Ramseier's and Travelers Indemnity's pattern of "racketeering activity," Plaintiffs have suffered the following defined injuries, to the extent proximately caused "by reason of" the RICO violation:

- Injury G — Lost business income (income lost from coerced diversion of labor away from Mr. Smith's own business pursuits — extortion consequence);
- Injury H — Below-market property sale (loss of property from coercion-induced financial duress);
- Injury I — Out-of-pocket remediation costs (loss of property from coerced compliance);
- Injury R — Increased medical expenses (loss of property: out-of-pocket sums paid for Mrs. Smith's treatment, to the extent proximately caused by the extortion predicates);
- Injury S — Mr. Smith's caregiving-related lost business income (loss of business: income lost from April 2025 through approximately August 2026 while Mr. Smith served as full-time caregiver for Mrs. Smith, as an economic consequence of Injury E, to the extent proximately caused by the extortion predicates);
- Injury R — Increased medical expenses (loss of property: out-of-pocket sums paid for Mrs. Smith's treatment, to the extent proximately caused by the extortion predicates);
- Injury K — Mold inspection cost (loss of property: out-of-pocket sums paid for the mold inspection in reliance on the microbial classification communicated by Wire Fraud Predicates #4–7, to the extent proximately caused by those predicates);
- Injury L — Opportunity cost of the mold-report path (loss of property and business: expenditures and delay incurred pursuing the mold-report path induced by Wire Fraud Predicates #4–7, to the extent proximately caused by those predicates);

- Injury E — Mrs. Smith's paralysis episodes (causal predicate — not a standalone RICO injury). Injury E is a personal injury proximately caused by the extortion predicates, and it is listed here solely because its economic consequences (Injuries G, I, R, S, and Q) are the RICO damages sought. Those business or property losses are recoverable under § 1964(c) even though they resulted from a personal injury. *See Medical Marijuana*, *Inc. v. Horn*, 604 U.S. 593 (2025);
- Injury F — Fear of physical violence (causal predicate — not a standalone RICO injury). Injury F is a personal injury proximately caused by the extortion predicates. The RICO damages flowing from Injury F are the economic consequences it produced: the diversion of the Smiths' time, capacity, and resources away from business pursuits (Injury Q) and the contribution to the stress cascade that triggered Mrs. Smith's paralysis episodes (Injury E) and their downstream economic losses (Injuries G, I, R, S). Plaintiffs do not seek RICO recovery for the fear itself;
- Injury Q — Loss of business opportunities (asserted only in the RICO counts). As defined in the Injury Definitions above, both Mr. Smith's technology ventures and Mrs. Smith's art and greeting-card business were brought to a near-complete halt by the racketeering pattern during Periods 2 and 3 (October 21, 2024 through approximately August 2026) through the four concurrent mechanisms described therein. That approximately twenty-two-month interruption has caused both direct lost revenue and consequential harm from lost first-mover advantage, expired licensing and funding windows, and the time-value of delayed commercial activity, in amounts to be determined at trial based on evidence including expert testimony presented under protective order if commercially necessary. Business losses during Period 1 (before October 21, 2024) are not claimed. Mrs. Smith's component of Injury Q is pled in the alternative to Injury T, and any overlap with Injury S is subject to the one-satisfaction rule;
- Other damages which will be illustrated at trial.

312. Plaintiffs seek treble damages under 18 U.S.C. § 1964(c) on the compensatory base attributable to the RICO predicates specifically. To the extent the RICO compensatory base overlaps with the compensatory base enhanced by DTPA trebling (Count 3) or exemplary damages

(Count 9), Plaintiffs will elect the greater enhancement for each non-overlapping compensatory component at the judgment stage—not the cumulative sum of all enhancements on the same base.

**K. Count 11 — RICO: 18 U.S.C. § 1962(d) (Against Defendants Ramseier, Travelers Indemnity, and Travelers Personal)**

*Primary Conduct: Conspiracy between Ramseier and Travelers Primary Injuries: Same as Count 10*

313. Plaintiffs incorporate by reference the paragraphs of Sections I through IV above and the allegations of Count 10 as if fully set forth herein, but do not incorporate the allegations of any other Count.

314. The claims against Travelers Indemnity in this Count relate back to August 6, 2025, as alleged in Relation Back and Timeliness as to Travelers Indemnity above, and are independently timely under the four-year RICO limitations period recognized in Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143 (1987), regardless of relation back, as alleged there.

315. Ramseier conspired with Travelers Indemnity and Travelers Personal to violate 18 U.S.C. § 1962(c) through a pattern of violations of 18 U.S.C. § 1951 and 18 U.S.C. § 1343. The conspiracy is evidenced by the facts set forth in RICO Case Statement 14 above, including Travelers Personal's assignment of the Claim to a Travelers Indemnity employee, Travelers Indemnity's provision of the email infrastructure for wire fraud transmissions, the management chain's reaffirmation of the microbial classification, the failure to discipline Ramseier, and the independent deployment of the identical method by another Travelers claims representative and a Travelers-deployed Sedgwick adjuster on separate claims.

316. As a result of Defendants' conspiracy, Plaintiffs have suffered the same defined injuries enumerated in Count 10 (Injuries E, F, G, H, I, K, L, Q, R, S), with Injuries E and F alleged solely as causal predicates of the business or property losses and not as standalone compensable RICO harms, as set forth in Count 10. Plaintiffs seek treble damages under 18 U.S.C. § 1964(c) on the compensatory base attributable to the RICO predicates specifically. To the extent the RICO compensatory base overlaps with the compensatory base enhanced by DTPA trebling (Count 3) or

exemplary damages (Count 9), Plaintiffs will elect the greater enhancement for each non-overlapping compensatory component at the judgment stage—not the cumulative sum of all enhancements on the same base. Injuries K and L are recoverable under this Count only to the extent the conspiracy encompassed Wire Fraud Predicates #4–7.

## VI. DAMAGES SEGREGATION

317. In accordance with the one-satisfaction rule and to facilitate the Court's management of overlapping theories, Plaintiffs identify the following damages-segregation framework:

**Category A Damages (Counts 1, 2, 3, 4)**

318. **Compensatory base (defined injuries)**:

- Injury A — Unpaid policy benefits (~$978,248);
- Injury A (time-value component) — Statutory interest at 18% per annum;
- Injury J — Public adjuster fees;
- Injury K — Mold inspection cost;
- Injury L — Opportunity cost of the mold-report path;
- Injury M — Betrayal distress (if *Stoker*/*Menchaca*-eligible).

**Enhancement**: DTPA treble damages (up to 3x additional damages for knowing violations under § 541.152(a)–(b)) plus Prompt Payment statutory interest (§ 542.060). These enhancements address the systemic claims-handling failures (Category A) and fraudulent inducement (Category C). They do not apply to any Category B injury (Injuries E, F, G, H, I, P, R).

In the alternative, to the extent the Court permits recovery of Category B injuries under the bad-faith counts (Counts 3 and 4), the following injuries are added to the Category A compensatory base on an alternative basis only: Injuries E, F, G, H, I, P, and R. DTPA treble damages would apply to this expanded compensatory base for knowing violations. This alternative framing does not alter the one-satisfaction rule: each injury is compensated once, and no single compensatory base receives more than one enhancement. Plaintiffs will elect among overlapping enhancement mechanisms at the post-verdict stage.

**Category B Damages and Independent Property Damages (Counts 5, 6, 8, 9, 10–11)**

319. **Compensatory base (defined injuries)**:

- Injury E — Mrs. Smith's paralysis episodes and medical consequences;
- Injury F — Fear of physical violence;
- Injury G — Lost business income;
- Injury H — Below-market property sale;
- Injury I — Out-of-pocket remediation costs;
- Injury P — Coercion submission distress (if *Stoker*/*Menchaca*-eligible);
- Injury R — Increased medical expenses;
- Injury S — Mr. Smith’s caregiving-related lost business income;
- Injury T — Mrs. Smith’s lost earning capacity;
- Injuries B, C, D — Additional property deterioration (arising from Category A/C claims-handling conduct; included in this damages basket because that conduct independently satisfies the § 41.003 gross negligence standard, as alleged in Count 9, and these injuries are not subject to DTPA trebling under Count 3).

**Enhancement**: For Injuries G, H, I, R, and S, either exemplary damages under § 41.003 (for malice/gross negligence) or RICO treble damages under § 1964(c)—whichever produces the greater recovery for each non-overlapping component. The RICO treble-damages alternative applies only to the business or property components of this basket (Injuries G, H, I, R, and S); Injuries E, F, and P are personal injuries not recoverable under 18 U.S.C. § 1964(c) and are eligible only for exemplary damages under § 41.003. Injury T is eligible for exemplary damages under § 41.003; its RICO counterpart is Mrs. Smith’s component of Injury Q, pled in the alternative, and Plaintiffs will elect between them. Injuries B, C, and D were caused by Category A/C claims-handling conduct that is not a RICO predicate; they are not asserted under Counts 10–11 and are eligible only for exemplary damages under § 41.003. Plaintiffs will elect at the judgment stage. The exemplary-damages enhancement in this basket addresses both the threatening and coercive conduct (Category B) and the grossly negligent claims-handling conduct (Categories A/C) that

independently caused Injuries B, C, D. Injuries A and J are not subject to exemplary damages under this basket; they receive DTPA trebling under Count 3. Injuries K, L, and M (Category C) are likewise not subject to exemplary damages here; they receive DTPA or RICO trebling as described below.

**Category C Damages (Count 7, partially Count 3)**

320. **Compensatory base (defined injuries)**:

- Injury K — Mold inspection cost (direct reliance expenditure);
- Injury L — Opportunity cost of the mold-report path;
- Injury M — Betrayal distress.

**Enhancement**: DTPA treble damages (as a knowing § 541.061 violation) or RICO treble damages under § 1964(c)—whichever is greater. These are fraud-exclusive reliance costs. They do not overlap with the negligence property-damage recovery in Count 5 (Injuries B, C, D) or the contract-benefits recovery in Count 1 (Injury A). Injuries K, L, and M appear in both Category A and Category C because the DTPA count (Count 3) encompasses both systemic failures and fraudulent inducement; however, for enhancement purposes, Injuries K, L, and M receive only one enhancement—DTPA trebling or RICO trebling, not both.

**RICO-Exclusive Damages (Counts 10–11 only)**

321. **Compensatory base (defined injuries)**:

- Injury Q — Loss of business opportunities (both Smiths), including Mr. Smith's curtailed patent-licensing, data-center hardware development, and software-development ventures and Mrs. Smith's curtailed art and greeting-card business.

Injury Q is asserted only in the RICO counts and is recoverable only if the RICO claims are sustained. Mr. Smith's caregiving-related lost business income and Mrs. Smith's lost earning capacity are separately pled under the state-law counts as Injuries S and T; to the extent Injury Q overlaps with Injury S or T, Plaintiffs will recover only once. Its quantification requires expert analysis as described in the Injury Definitions. Enhancement: Mandatory RICO treble damages under § 1964(c).

**Other**

322. Injury N (generalized anxiety) and Injury O (ALE displacement distress) are not asserted as independently compensable emotional-distress injuries in any count. They are alleged in the Factual Background solely as causal context for Injury E and to establish the baseline stress environment in which the paralysis episodes occurred. The economic components of Injury O (unreimbursed lease costs, moving expenses, refused ALE reimbursements) are subsumed within Injury A as unpaid policy benefits.

**One-Satisfaction Acknowledgment**

323. Plaintiffs acknowledge that the one-satisfaction rule permits only one compensatory recovery for each distinct injury regardless of how many legal theories establish liability for causing it. Where multiple counts reach the same injury (as identified above), Plaintiffs seek recovery under whichever count affords the greatest total recovery—not the cumulative sum of all counts' awards for the same injury. Plaintiffs further acknowledge that no single compensatory base should receive more than one punitive or treble-damages enhancement. Plaintiffs will elect among overlapping enhancement mechanisms at the post-verdict stage based on which produces the greater result for each non-overlapping compensatory component.

## VII. ATTORNEYS' FEES

324. Plaintiffs may engage attorneys to prosecute this lawsuit and agreed to pay reasonable attorneys' fees and expenses through trial and any appeal.

325. Plaintiffs are entitled to reasonable and necessary attorneys' fees pursuant to Texas Civil Practice and Remedies Code Sections 38.001–38.003.

326. Plaintiffs further pray for all reasonable attorneys' fees incurred in prosecuting Plaintiffs' causes of action through trial and any appeal pursuant to Sections 541.152 and 542.060 of the Texas Insurance Code as well as 18 U.S.C. § 1964(c).

## VIII. CONDITIONS PRECEDENT

327. Plaintiffs satisfy the following conditions precedent:

(a) On May 19, 2025, Plaintiffs served Travelers Personal with pre-suit notice complying with Tex. Ins. Code § 541.154 and Tex. Bus. & Com. Code § 17.505(a), describing the specific complaints and the amounts of damages and attorneys' fees; more than 60 days elapsed before this action was filed on August 6, 2025. Travelers Personal answered on September 23, 2025 and did not file a plea in abatement within 30 days thereafter.

(b) Within five days of the filing of this Plaintiffs' First Amended Complaint with the Clerk of Court, Plaintiffs will serve Travelers Indemnity, through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218, by certified mail, return receipt requested, with written notice complying with Tex. Ins. Code § 541.154 and Tex. Bus. & Com. Code § 17.505(a), advising of the specific complaints and the amount of economic damages, mental-anguish damages, and expenses, including attorneys' fees.

(c) The May 19, 2025 notice to Travelers Personal also constituted notice to Travelers Indemnity, which operates the shared claims infrastructure through which the Claim and the notice were handled and employs the adjuster whose conduct the notice described.

(d) To the extent any claim against Travelers Indemnity under Chapter 541 or the DTPA is asserted fewer than 60 days after the notice described in (b), notice was impracticable because filing was necessary to prevent the expiration of limitations. Tex. Ins. Code § 541.154(c)(1); Tex. Bus. & Com. Code § 17.505(b).

(e) Alternatively, any deficiency in notice to Travelers Indemnity does not bar any claim; the sole remedy is abatement of the Chapter 541 and DTPA claims only, continuing until 60 days after the notice described in (b). Tex. Ins. Code § 541.155; Tex. Bus. & Com. Code § 17.505(c)–(e). No notice requirement applies to Plaintiffs' contract, prompt-payment, tort, or RICO claims.

(f) All other conditions precedent to Plaintiffs' right to recover have been performed, have occurred, or have been waived. Fed. R. Civ. P. 9(c).

## IX. JURY DEMAND AND PRAYER

328. Plaintiffs request that a jury be convened to try the factual issues of this case.

329. WHEREFORE, PREMISES CONSIDERED, David Smith and Misty Smith pray that, upon final hearing of the case, they recover from Defendants as follows:

a. **Contract Damages – Injury A and Consequential Damages – Injury J**: All unpaid policy benefits under Dwelling Coverage, Contents/Personal Property Coverage, Additional Living Expense Coverage, and Ordinance or Law Coverage, together with consequential damages including public adjuster fees (Injury J), in an amount to be determined at trial;

b. **Statutory Interest on Injury A**: Pre-judgment interest at 18% per annum under Texas Insurance Code § 542.060 on all unpaid benefits from the date such benefits should have been paid;

c. **DTPA Treble Damages on Category A and C Injuries (Injuries A, J, K, L, M):** Additional damages not exceeding three times the actual damages caused by Defendants' knowing violations of Texas Insurance Code Chapter 541 and the DTPA, applied to the compensatory base comprising Injury A (unpaid benefits), Injury J (public adjuster fees), Injury K (mold inspection cost), Injury L (opportunity cost of mold-report path), and Injury M (betrayal distress);

d. **Exemplary Damages on Category B and Independent Property Injuries (Injuries E, F, G, H, I, P, R, S, T, B, C, D):** Exemplary damages under Texas Civil Practice & Remedies Code § 41.003 for Defendants' gross negligence and/or malice, applied to the compensatory base comprising Injury E (paralysis episodes), Injury F (fear of violence), Injury G (lost income), Injury H (below-market sale), Injury I (out-of-pocket costs), Injury P (coercion submission distress), Injury R (medical expenses), Injury S (caregiving-related lost business income), Injury T (Mrs. Smith's lost earning capacity), and Injuries B, C, D (additional property deterioration arising from grossly negligent claims handling);

e. **RICO Treble Damages on Category B Business or Property Injuries and Category C Injuries (as alternative to (c) and (d) on overlapping components):** Treble damages under 18 U.S.C. § 1964(c) apply only to the business or property components of Category B injuries (Injuries G, H, I, R, and S) and to Category C Injuries K and L. Injuries E, F, M, and P are

excluded from RICO trebling as personal injuries and are alleged under the RICO counts solely as causal predicates. Injuries B, C, and D are not caused by any RICO predicate and are not subject to RICO trebling; they are addressed solely by item (d). These treble damages are sought as an alternative to exemplary damages on Injuries G, H, I, R, and S and as an alternative to DTPA trebling on Injuries K and L, with Plaintiffs to elect the greater enhancement for each non-overlapping injury at the judgment stage;

f. **RICO-Exclusive Damages — Injury Q Damages:** Treble damages on the loss of business opportunities sustained by David Smith and Misty Smith (Injury Q), recoverable only under 18 U.S.C. § 1964(c), in amounts to be determined at trial;

g. **Independent-Injury Compensatory Damages (all injuries other than Injury A):** Compensatory damages for each defined independent injury as follows: Injury E (paralysis episodes and medical consequences); Injury F (fear of physical violence); Injury G (lost business income); Injury H (below-market property sale); Injury I (out-of-pocket remediation costs); Injury P (coercion submission distress); Injury R (increased medical expenses); Injury S (caregiving-related lost business income); Injury T (Mrs. Smith's lost earning capacity); Injuries B, C, D (additional property deterioration); Injury K (mold inspection cost); Injury L (opportunity cost of mold-report path); Injury M (betrayal distress); and Injury Q (loss of business opportunities, in the alternative to Injury T and without duplication of Injury S)—each recovered once regardless of how many counts establish liability;

h. **Attorneys' Fees:** Reasonable attorneys' fees through trial and any appeal under Texas Civil Practice & Remedies Code §§ 38.001–38.003, Texas Insurance Code §§ 541.152 and 542.060, and 18 U.S.C. § 1964(c);

i. **Costs of Court**;

j. **Pre-Judgment Interest** at the legal rate on all non-statutory-interest damages;

k. **Post-Judgment Interest** at the legal rate;

l. **Such other and further relief**, general or special, at law or in equity, to which David Smith and Misty Smith may show themselves to be justly entitled.

Respectfully submitted,

/s/David Smith

David Smith, *pro se*

3505 Parkway Terrace

Bryan, Texas 77802

Telephone: 512-417-4280

Email: dsmith@payexpress.com

Plaintiff, Pro Se

/s/Misty Smith

Misty Smith, *pro se*

3505 Parkway Terrace

Bryan, Texas 77802

Telephone: 512-417-4280

Email: misty@mistysmith.com

Plaintiff, Pro Se

Dated: September 30, 2026

## CERTIFICATE OF SERVICE

I certify that on September 30, 2026, I electronically filed the foregoing Plaintiffs' First Amended Complaint with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel of record registered as Filing Users. Newly added Defendants The Travelers Indemnity Company and Benjamin Ramseier will be served with summons and the First Amended Complaint pursuant to Federal Rule of Civil Procedure 4 following issuance of summons by the Clerk. The following is known counsel of record who will be served through the Notice of Electronic Filing:

James W. Holbrook, III
Texas Bar No. 24032426
jholbrook@zellelaw.com
Zelle LLP
901 Main Street, Suite 4000
Dallas, TX 75202-3975
Telephone: 214-742-3000
Facsimile: 214-760-8994

/s/David Smith
David Smith, *pro se*
/s/Misty Smith
Misty Smith, *pro se*